**UNITED STATES of America, Plaintiff,**

v.

**Jorge RESTREPO, Defendant.**

**No. 91 CR 1399 (ERK).**

United States District Court,
E.D. New York.

Aug. 17, 1992.

Andrew J. Maloney, U.S. Atty., E.D. N.Y. by Julie E. Katzman, Asst. U.S. Atty., Brooklyn, N.Y., for plaintiff.

Robert C. Dorf, New York City, for defendant.

## CORRECTED MEMORANDUM AND ORDER

KORMAN, District Judge.

The issue presented by this case is whether unusually harsh collateral consequences that are visited by law on a defendant as a result of his conviction may provide a basis for mitigating the penal sanction that would otherwise be required by the Sentencing Guidelines. Collateral consequences are not part of the judgment of conviction and are not imposed upon the defendant for the purpose of punishing him. The effect of such consequences, however, may be as punitive as a term of incarceration. This is particularly true here where the collateral consequence is deportation and where a consequence of that consequence is a longer period of imprisonment under more severe conditions than would apply to a United States citizen convicted of the same offense.

The extraordinary harsh and disparate nature of this penalty was acknowledged by the Supreme Court in *Jordan v. De George*, 341 U.S. 223, 71 S.Ct. 703, 95 L.Ed. 886 (1951), where it addressed the issue of whether former Section 19(a) of the Immigration Act of 1917, which provided for deportation of an alien who had been convicted twice of a "crime involving moral turpitude," lacked sufficiently definite standards to withstand a challenge to its constitutionality based on the "void for vagueness" doctrine. *Id.* at 229, 71 S.Ct. at 707. While this doctrine is intended to ensure adequate notice to individuals of the criminal consequences of their conduct, the Supreme Court held that it would be applied to test the constitutionality of former Section 19(a) of the Immigration Act even though "this statute does not declare certain conduct to be criminal." *Id.* at 230, 71 S.Ct. at 707. Chief Justice Vinson explained:

> We do this in view of the grave nature of deportation. The Court has stated that 'deportation is a drastic measure and at times the equivalent of banishment or exile.... It is the forfeiture for misconduct of a residence in this country. Such a forfeiture is a penalty.'

*Id.* at 231, 71 S.Ct. at 707–08 (citation omitted).

Although three justices dissented from the majority opinion, which upheld the constitutionality of former Section 19(a) as applied to the offense of which the alien in

*Jordan* had been convicted, the Supreme Court was unanimous in its view of deportation as a quasi-criminal punishment. Indeed, Justice Jackson began the dissenting opinion by emphasizing both the harshness of the penalty and its disparate impact:

> Respondent, because he is an alien, and because he has twice been convicted of crimes the Court holds involve 'moral turpitude,' is punished with a life sentence of banishment in addition to the punishment which a citizen would suffer for the identical acts.

*Id.* at 232, 71 S.Ct. at 708.

The threads that run through the majority and dissenting opinions in *Jordan* meet in the present case. The defendant, Jorge Restrepo, is an alien who enjoys the status of a permanent resident. Convicted of attempting to smuggle 562.5 grams of a substance of which 28% was heroin, Mr. Restrepo faces a sentence of 41–51 months under the Sentencing Guidelines, the same sentence a United States citizen would face under similar circumstances. Unlike a United States citizen, however, an alien who is convicted of such an offense must be deported, *see* 8 U.S.C.A. § 1251(a)(2)(A) and (B) (Supp.1992), unless he meets the threshold criteria set out in the Immigration and Nationality Act that render him eligible to ask the Attorney General to exercise his discretion to suspend deportation. *See* 8 U.S.C.A. §§ 1182(c), 1254(a)(2) (1970 & Supp.1992).

The defendant can meet neither the "strict threshold criteria" applicable under section 1254(a)(2), *see Immigration and Naturalization Service v. Phinpathya*, 464 U.S. 183, 195, 104 S.Ct. 584, 592, 78 L.Ed.2d 401 (1984), nor the more lenient threshold criteria of section 1182(c), *see Castillo–Felix v. Immigration and Naturalization Service*, 601 F.2d 459 (9th Cir. 1979) (discussing applicability of section 1182(c) and distinguishing it from suspension of deportation under section 1254(a)(2)). Under section 1182(c), an alien must have "a lawful unrelinquished domi-cile of seven consecutive years" before the Attorney General can exercise his discretion to suspend deportation. *See Francis v. Immigration and Naturalization Service*, 532 F.2d 268, 270 (2d Cir.1976); *Variamparambil v. Immigration and Naturalization Service*, 831 F.2d 1362, 1364 n. 1 (7th Cir.1987).

The presentence report here indicates that, although Mr. Restrepo entered the United States in 1985, his "lawful" domicile, as that phrase is defined, *see Lok v. Immigration and Naturalization Service*, 681 F.2d 107, 109–10 (2d Cir.1982), did not commence until March 8, 1991 when he was admitted as a conditional permanent resident. Thus, even after serving his sentence, the defendant will not be able to satisfy the most lenient of the statutory requirements for obtaining discretionary relief from deportation. Moreover, even if he were eligible to seek such relief, it would, in all probability, be denied. *See Blackwood v. Immigration and Naturalization Service*, 803 F.2d 1165 (11th Cir. 1986); *Akinyemi v. Immigration and Naturalization Service*, 969 F.2d 285 (7th Cir.1992). Accordingly, for the crime that he committed, Mr. Restrepo will be punished with "a life sentence of banishment in addition to the punishment which a citizen would suffer for the identical acts." *Jordan v. De George*, 341 U.S. at 232, 71 S.Ct. at 708 (Jackson, J., dissenting).

■ Moreover, solely because of his status as a deportable alien, the defendant's sentence will be served under circumstances that are more severe than those facing a United States citizen under similar circumstances. Unlike United States citizens who commit the same offense, who are equally culpable and who receive the identical guideline sentence, the defendant will not be eligible to serve his sentence in a minimum security facility, nor a portion of the last 10% of his sentence in a halfway house or other community custody program, including home confinement.[1]

---

1. Title 18 U.S.C. § 3624(c), charges the Bureau of Prisons with assuring, "to the extent practicable ... that a prisoner serving a term of imprisonment spends a reasonable part, not to exceed six months, of the last ten per centum of the term" in a halfway house or other community custody program that may include "home confinement." 18 U.S.C.A. § 3624(c) (Supp.1992).

The defendant's ineligibility for this significant reduction of time in jail derives from a Public Security Factor, or "PSF" designation, that he will receive from the Bureau of Prisons after he is sentenced. The designation signifies that his incarceration "require[s] increased security measures to ensure the protection of society." Federal Bureau of Prisons, Program Statement 5100.4: Security Designation and Custody Classification Manual (1992); Gov't's App.Ex. G at 5. This designation, which renders a prisoner ineligible to serve his sentence in a minimum security facility or in a halfway house, is reserved for offenders with convictions for serious or repetitive crimes of violence, sex offenders whose current offense or history involves aggressive sexual behavior, offenders whose current offense or prior history indicates a significant threat to a government official and those who have more than ten years remaining on their sentence. *Id.* at 5–8.

■ Unless he fits within a narrow exception, an inmate who is a "deportable alien" is also automatically included in the group of those from whom society requires protection:

> Deportable Alien: An inmate who is not a citizen of the U.S. and does not meet all of the following criteria:
> 1. Verified strong family/community ties in the U.S.
> 2. Verified history of domicile (five years or more) in the U.S.
> 3. Verified history of stable employment in the U.S.
> Non-U.S. citizen inmates who do not meet all of the above criteria will not be housed in a minimum security facility or a community corrections center unless the PSF has been waived by the Regional Director. This requirement does not apply to non-U.S. citizens for whom the

Immigration and Naturalization Service (USINS) has determined that deportation proceedings will not be initiated. *Id.* at 7.

The defendant's presentence report indicates that he entered the United States in 1985 and that he became a conditional permanent resident on March 8, 1991. He is married to a United States citizen with whom he has fathered three children.[2] The presentence report, however, can not "verify" the defendant's initial date of entry into the United States, nor can it "verify" his history of employment here. Accordingly, the defendant will not come within the limited group of deportable aliens who are excepted from the PSF designation.

The PSF designation is not the last of the consequences that follow solely because a defendant is a deportable alien. Some time before the end of his sentence, normally the last month, the Immigration and Naturalization Service ("INS") will file a detainer with the Bureau of Prisons. While the lodging of the detainer has no effect on the PSF classification, it will require further incarceration of the defendant in an INS detention facility while he awaits deportation proceedings that should have been undertaken while he was serving his prison sentence.[3] *See Soler v. Scott*, 942 F.2d 597, 600–01 (9th Cir.1991), *petition for cert. filed*, (July 8, 1992); Letter from Arthur C. Helton, Director, Refugee Project, Lawyers Committee for Human Rights, dated July 22, 1992, at 5–9. According to a recent report of the United States General Accounting Office, the average length of time criminal aliens are detained in INS facilities is 59 days. United States General Accounting Office, Immigration Control: Immigration Policies Affect INS Detention Efforts 25 (1992); Helton App.Ex. B.

The United States Attorney devotes a considerable part of his argument to justi-

---

**2.** The defendant was married on March 18, 1990, and his resident alien status is conditioned on remaining married for at least three years.

**3.** Resident alien "aggravated felons," a definition that encompasses the defendant, *see* 8 U.S.C. § 1101(a)(43), are only eligible to be released on bond while awaiting deportation proceedings and after they have served their sentence if they have been in the United States for at least seven years. Approximately 20% of such resident aliens are released on bond. Memorandum from Tony Garoppolo, Deputy Chief United States Probation Officer, dated June 9, 1992, at 2.

fying the disparate treatment to which aliens are subject. This argument, however, misses the point. Even if deportation is reasonable and the disparate treatment is justified, this does not change the fact that for a resident alien who is convicted of a drug-related offense, "the punishment for a crime is not the same as the one imposed on [a] nonalien who has committed the same act." Sol Rubin, *The Law of Criminal Correction* § 15, at 632 (1963). Thus, the germane question is whether some downward adjustment in the 41–51 month guideline range is appropriate to mitigate the extraordinary and disparate penalty the defendant faces as a result of his conviction.

### Discussion

The United States Attorney poses a threshold objection to such an adjustment that should be addressed at the outset of the discussion. Specifically, he suggests that any collateral consequence suffered by the defendant because of his status as an alien—whether it be the loss of permanent residence status, harsher treatment by the Bureau of Prisons, or ineligibility for service of the last 10% of his sentence in a half-way house—cannot be the basis for a downward departure, *nor* can it be a basis for choosing a sentence at the lower end of the guideline range. Gov't's Corrected Mem. of Law at 10–11 & n. 6.

The reasoning that underlies this argument may be summarized as follows: The collateral consequences described above are imposed by Congress or the Executive Branch because the defendant is an alien. Any adjustment of a sentence that takes account of the collateral consequences is necessarily based on the defendant's status as an alien. While a sentencing judge's desire to mitigate the harshness of such consequences is "undoubtedly benign," it is impermissible because it "injects national origin considerations into the sentencing determination." *Id.* at 12. This argument is frivolous.

There is no question that national origin is a factor that is "not relevant in the determination of a sentence." United

States Sentencing Commission, Guidelines Manual, § 5H1.10, p.s. (Nov.1991). Indeed, Congress explicitly directed the Sentencing Commission to "assure that the guidelines and policy statements are entirely neutral as to the race, sex, national origin, creed, religion and socioeconomic status of offenders." 28 U.S.C. § 994(d) (1988). What the United States Attorney ignores, however, is the definition of "national origin."

"The term 'national origin' on its face refers to the country where a person was born, or, more broadly, the country from which his or her ancestors came." *Espinoza v. Farah Manufacturing Co. Inc.*, 414 U.S. 86, 88, 94 S.Ct. 334, 336, 38 L.Ed.2d 287 (1973). It is not synonymous with alienage. Indeed, the Supreme Court has held that Title VII of the Civil Rights Act of 1964, which prohibits discrimination in employment based on "national origin," does not make "it illegal to discriminate on the basis of citizenship or alienage." *Id.* at 95, 94 S.Ct. at 340. Consistent with this reasoning, the Sentencing Commission itself takes alienage—as opposed to national origin—into account in formulating certain guidelines. *See* U.S.S.G. § 2L1.1(b)(3) ("If the defendant is an unlawful alien who has been deported (voluntarily or involuntarily) on one or more occasions prior to the instant offense … increase to level 8.").

The foregoing is not intended to suggest that, even in the absence of an explicit statutory prohibition, it would generally be appropriate to take citizenship or alienage into account in deciding the length of a sentence. The downward departure proposed here is not intended to reward alienage or penalize citizenship. On the contrary, however imperfectly it is accomplished, one of the purposes of the departure is to ensure a measure of equality in the penalty that is imposed on defendants who are guilty of comparable criminal acts. As the Legal Aid Society, which appears as *amicus curiae*, aptly observes:

The basis of the proposed departure is not that the defendant is of a particular nationality but that he is subject to the functional equivalent of extra punishment solely because of his status as a

convicted alien. Just as the prohibition against considering 'sex' does not preclude a court from departing because of a single mother's extraordinary responsibilities, *United States v. Johnson*, No. 91–1515(L), slip op. at 3737 [964 F.2d 124] (2d Cir. May 14, 1992), *United States v. Peña*, 930 F.2d 1486, 1494 (10th Cir.1991) or the youthful and fragile appearance of a young man, *United States v. Gonzalez*, 945 F.2d 525 (2d Cir.1991), and the Indian origin of the defendant did not preclude a departure in *United States v. Big Crow*, 898 F.2d 1326 (8th Cir.1990) so, here, the contemplated departure is based solely on the legal consequences of alienage not on the fact of foreign birth.

Letter from Henriette Hoffman, Attorney-in-Charge, Legal Aid Society, Criminal Appeals Bureau, Federal Defender Services Unit, dated July 21, 1992, at 3.

*United States v. Alvarez–Cardenas*, 902 F.2d 734 (9th Cir.1990), upon which the United States Attorney relies, does hold that deportation is not a ground for downward departure because "[t]he possibility of deportation does not speak to the offense in question, nor does it speak to the offender's character." *Id.* at 737. The Court of Appeals for the Second Circuit, however, has repeatedly sustained downward departures on grounds that do not speak to the offense in question or to the offender's character, and there is no reason why such factors should not be taken into account when they are relevant to the determination of a just sentence. *See United States v. Johnson*, 964 F.2d 124 (2d Cir. 1992); *United States v. Gonzalez*, 945 F.2d 525 (2d Cir.1991); *United States v. Garcia*, 926 F.2d 125 (2d Cir.1991); *United States v. Lara*, 905 F.2d 599 (2d Cir.1990).

Because the threshold objection raised by the United States Attorney is without merit, it is appropriate to analyze the departure proposed here within the sentencing framework established by Congress. The Sentencing Reform Act of 1984, as originally enacted, mandated a sentence within the guideline range "unless the court [found] that an aggravating or mitigating circum-

stance exist[ed] that was not adequately taken into consideration by the Sentencing Commission in formulating the guidelines...." 18 U.S.C. § 3553(b) (1982 & Supp. II 1984). In 1987, Congress amended the section to make a departure permissible if "the court finds that there exists an aggravating or mitigating circumstance *of a kind, or to a degree,* not adequately taken into consideration by the Sentencing Commission in formulating the guidelines...." 18 U.S.C. § 3553(b) (1988) (emphasis added). At the same time, the section was also amended to add that "[i]n determining whether a circumstance was adequately taken into consideration, the court shall consider only the sentencing guidelines, policy statements, and official commentaries of the Sentencing Commission." *Id.*

During the course of a colloquy on the floor of the Senate, which was intended to provide assurance that no significant change was being effected by the 1987 amendments, Senator Kennedy, the principal sponsor of the Sentencing Reform Act, gave the following explanation:

> The addition of the words 'of a kind or to a degree' is intended to make clear what is already implicit in current law, that a factor can be found not to have been adequately considered either first, because it is not reflected in the applicable guidelines at all, or second, because it is not reflected to the unusual extent that it is present in a particular case. The bill further makes clear that the ultimate test of whether a factor was adequately taken into consideration by the Sentencing Commission in formulating the guidelines rests on a fair reading of what the guidelines, policy statements and official commentary of the Commission actually say. These are the official pronouncements of the Commission, and departure will not be appropriate if these pronouncements indicate that the factor was included in the guidelines by the Commission.

133 Cong.Rec. S16648 (daily ed. Nov. 20,

1987).[4]

"[S]ince a circumstance not taken into account cannot, a fortiori, have been adequately considered," the first step in the analysis prescribed by Section 3553(b) is to determine whether collateral consequences, particularly those at issue here, were considered by the Sentencing Commission when it formulated the guidelines applicable to the defendant's offense. 133 Cong. Rec. H10017 (daily ed. Nov. 16, 1987) (section by section analysis of proposed amendments to the Sentencing Reform Act of 1984). The United States Attorney argues that "the Sentencing Commission must be aware that aliens are generally deported after they serve their sentences," Gov't's Corrected Mem. of Law at 14, and thus, presumably, must have adequately considered this consequence in the formulation of the applicable guideline. It is not disputed, however, that the Sentencing Commission never explicitly addressed the role, if any, that collateral consequences, including deportation, should play in the imposition of a sentence. As recognized by the Court of Appeals for the Ninth Circuit in *Alvarez–Cardenas,* Chapter Two, Part L of the guidelines "lists several immigration offenses, but, the section is silent on whether the threat of deportation is a legally permissible ground for departing from the Guidelines. No other section directly addresses that issue." *Alvarez–Cardenas,* 902 F.2d at 737.

Under these circumstances, even if the speculation of the United States Attorney as to the thought process of the Sentencing Commission is correct, it must be assumed that the Commission did not consider the collateral consequences at issue here. *See* 18 U.S.C. 3553(b) (1988). Indeed, the legislative history of Section 3553(b) tells us that, "[e]ven though minutes of Commission meetings, other Commission records, or testimony of a member of the Commission might indicate that a circumstance was adequately considered in the formulation of the guidelines, the court cannot consider such minutes, records or testimony." 133 Cong.Rec. H10017 (daily ed. Nov. 16, 1987) (section by section analysis of proposed amendments to the Sentencing Reform Act of 1984). The United States Attorney does not even rely on the kind of hard evidence that Congress explicitly directed a sentencing judge to ignore.

The failure of the Sentencing Commission to consider the mitigating circumstances at issue here makes it necessary to determine whether these circumstances should result in a sentence different from that called for by the guidelines. This determination, in turn, involves an evaluation of the mitigating circumstances in light of the purposes of a sentence. Section 3553(a) of the Sentencing Reform Act provides that "[t]he court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." 18 U.S.C. § 3553(a) (1988). These purposes are "the need for the sentence imposed— (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner...." *Id.*

Of the four purposes of a sentence that must be considered when a sentence is imposed, three have particular relevance here. The first is the need for the sentence "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." *Id.*

This purpose—essentially the 'just deserts' concept—should be reflected clearly in all sentences; it is another way of

---

**4.** A similar statement was made by Senator Biden, the Chairman of the Senate Judiciary Committee. *See* 133 Cong.Rec. S16647 (daily ed. Nov. 20, 1987). While Representative Conyers, who shepherded the amendments through the House of Representatives, took a somewhat different view of the original intent of the Sentencing Reform Act, his analysis of the purpose of the amendments to Section 3553(b) was the same as that of Senator Kennedy. *See id.* at H10014–21 (daily ed. Nov. 16, 1987).

saying that the sentence should reflect the gravity of the defendant's conduct. From the public's standpoint, the sentence should be of a type and length that will adequately reflect, among other things, the harm done or threatened by the offense, and the public interest in preventing a recurrence of the offense. *From the defendant's standpoint the sentence should not be unreasonably harsh under all the circumstances of the case and should not differ substantially from the sentence given to another similarly situated defendant convicted of a similar offense under similar circumstances.*

S.Rep. No. 225, 98th Cong., 1st Sess. 75–76 (1983), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3258–59 (emphasis added).

█ The formulation of a sentence that is not "unreasonably harsh under all of the circumstances of the case" must surely take into account a penalty such as deportation that is visited upon the defendant by law as the result of his conviction. *See* Tony Garoppolo, *The Sentencing Reform Act: A Guide For Defense Counsel* 79–80 (1990) ("[C]ollateral consequences can justify imposing a sentence less severe than the guideline range in order to insure that the collective punishment ... is not unduly harsh."). Moreover, if a sentence is to be imposed that does "not differ substantially from the sentence given to another similarly situated defendant convicted of a similar offense under similar circumstances," it must necessarily be adjusted to reflect the harsher treatment an alien may suffer at the hands of the Bureau of Prisons, which is, in a sense, a collateral consequence of the penalty of deportation. *See United States v. Lara*, 905 F.2d 599, 603 (2d Cir. 1990) (downward departure justified where the "severity" of defendant's prison term is "exacerbated by his placement in solitary confinement as the only means of segregating him from other inmates.").

█ A downward departure based on these collateral consequences is further consistent with the second and third purposes of a sentence outlined in section 3553(a)(2). A moderate downward depar-

ture will not undermine the deterrent effect of the punishment contemplated by the guidelines promulgated for this offense. *See* 18 U.S.C. § 3553(a)(2)(B) (1988). Where a collateral consequence is harsh and follows directly from the conviction of an offense, it constitutes an added deterrent to the commission of a crime and will surely compensate for any diminution in the deterrent effect of a shorter term of imprisonment. Moreover, because the nonpenal purpose of deportation is to ensure that defendants do not commit additional crimes in the United States, *Mahler v. Eby*, 264 U.S. 32, 39, 44 S.Ct. 283, 286, 68 L.Ed. 549 (1924), the collateral consequence itself furthers the purpose of "protect[ing] the public from further crimes of the defendant." 18 U.S.C. § 3553(a)(2)(C) (1988).

The United States Attorney "does not contend that collateral consequences can never warrant departure." Gov't's Corrected Mem. of Law at 19 n. 16. On the contrary, he concedes that "[i]n a particular case, unusual and extraordinary consequences may well constitute a mitigating circumstance of a kind not adequately taken into consideration by the Commission." *Id.* The United States Attorney argues, however, that a departure is not warranted here because the collateral consequences that the defendant will suffer are common to all aliens and, therefore, are not sufficiently "unusual" to warrant a downward departure. *Id.* at 12–13.

The Sentencing Commission did suggest that the downward departures it foresaw would occur only in an "unusual" case. U.S.S.G. Ch.1, Pt.A 4(b), p.s. This suggestion is accurate to the extent that a downward departure is based on offense characteristics. Because the Commission intended that each guideline be treated "as carving out a 'heartland,' a set of typical cases embodying *the conduct that each guideline describes*," it is obvious that a departure based on the characteristics of the offense would only occur in an atypical case, *i.e.,* "one to which a particular guideline linguistically applies but where *conduct* significantly differs from the norm...." *Id.* (emphasis added). Similar-

ly, a departure would generally be unusual where the Sentencing Commission indicates that a particular consideration, such as family ties and responsibilities, should not "ordinarily" be regarded as relevant. U.S.S.G. § 5H1.6, p.s. *See United States v. Johnson,* 964 F.2d 124, 128–29 (2d Cir. 1992).

If the Sentencing Commission had followed the approach discussed in the legislative history of the Sentencing Reform Act, any departure would also have involved a rare or unusual case. *See* S.Rep. No. 225, 98th Cong., 1st Sess. 78–79 (1983), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3161–62. Specifically, the Senate Judiciary Committee

> encourag[ed] the Sentencing Commission to explore the relevancy to the purposes of sentencing of all kinds of factors, whether they are obviously pertinent or not; to subject those factors to intelligent and dispassionate professional analysis; and on this basis to recommend, with supporting reasons, the fairest and most effective guidelines it can devise.

S.Rep. No. 225 at 175, 1984 U.S.C.C.A.N. at 3358.

The Sentencing Commission did not undertake the kind of effort envisioned by Congress. Instead, finding it impracticable, if not impossible to do so, the Commission chose to delegate much of this task to sentencing judges subject to the Commission's ultimate power to revise the end product of their case by case application of the guidelines. As the Commission stated:

> [I]t is difficult to prescribe a single set of guidelines that encompasses the vast range of human conduct potentially relevant to a sentencing decision. The Commission also recognizes that the initial set of guidelines need not do so. The Commission is a permanent body, empowered by law to write and rewrite guidelines, with progressive changes, over many years. By monitoring when courts depart from the guidelines and by analyzing their stated reasons for doing so and court decisions with references thereto, the Commission, over time, will be able to refine the guidelines to specify

more precisely when departures should and should not be permitted.

U.S.S.G. Ch.1, Pt.A 4(b), p.s.

Thus, the Commission may choose to override judicially created grounds for departure, just as Congress may override those created by the Commission. Indeed, the Commission has made amendments to the Sentencing Guidelines, some of which are already in effect, that limit or override holdings permitting downward departures based on a defendant's "youthful lack of guidance," *United States v. Floyd,* 945 F.2d 1096 (9th Cir.1991), youthful and feminine appearance, *United States v. Gonzalez,* 945 F.2d 525 (2d Cir.1991) and "exemplary citizenship," *United States v. Turner,* 915 F.2d 1574 (6th Cir.1990). *See* 57 Fed.Reg. 20,160 (1992) (amendment of U.S.S.G. § 5H1.2, effective Nov. 1, 1992); U.S.S.G. § 5H1.4, p.s.; § 5H1.11 p.s. Until the Sentencing Commission acts, however, only the factors prescribed by Congress in Section 3553(a)(2) inform and limit the discretion of a judge to depart on the basis of a factor not expressly considered by the Commission. *See* Daniel J. Freed, *Federal Sentencing in the Wake of Guidelines: Unacceptable Limits on the Discretion of Sentencers,* 101 Yale L.J. 1681, 1708–10 (1992). *See also United States v. Correa-Vargas,* 860 F.2d 35, 40 (2d Cir.1988).

The approach suggested here, which would permit a departure even where the mitigating circumstance is not unusual, is consistent with the policy statement that specifically addresses departures pursuant to Section 3553(b). Chapter Five, Part K of the Sentencing Guidelines advises that when a departure is contemplated on the basis of a factor that the Sentencing Commission took into account, the departure is appropriate "if the court determines that, *in light of unusual circumstances,* the guideline level attached to that factor is inadequate." U.S.S.G. § 5K2.0, p.s. (emphasis added). On the other hand, the presence of any factor not expressly considered may warrant departure *"under some circumstances, in the discretion of the sentencing court." Id.* (emphasis add-

ed). *See United States v. Ryan,* 866 F.2d 604, 609–10 (3rd Cir.1989).[5]

The penalty of deportation, not to speak of the disparate treatment that the defendant will receive at the hands of the Bureau of Prisons based on factors unrelated to the crime he has committed, is perhaps the most severe and drastic collateral consequence that can result from the conviction of an offense. While the Supreme Court has held that "deportation is not technically a criminal punishment," *Fiswick v. United States,* 329 U.S. 211, 222 n. 8, 67 S.Ct. 224, 230 n. 8, 91 L.Ed. 196 (1946), its holdings have been informed consistently by its recognition of deportation as a "penalty" of the most severe magnitude, *Fong Haw Tan v. Phelan,* 333 U.S. 6, 10, 68 S.Ct. 374, 376, 92 L.Ed. 433 (1933), that is "close to punishment for crime." *Galvan v. Press,* 347 U.S. 522, 531, 74 S.Ct. 737, 742, 98 L.Ed. 911 (1953). *See also Fiswick v. United States,* 329 U.S. at 221–22, 67 S.Ct. at 229–30; *Jordan v. De George,* 341 U.S. 223, 231, 71 S.Ct. 703, 707–08, 95 L.Ed. 886 (1951); *Barber v. Gonzales,* 347 U.S. 637, 642–643, 74 S.Ct. 822, 825, 98 L.Ed. 1009 (1954); *Gastelum–Quinones v. Kennedy,* 374 U.S. 469, 479, 83 S.Ct. 1819, 1824, 10 L.Ed.2d 1013 (1963); *Costello v. Immigration and Naturalization Service,* 376 U.S. 120, 131, 84 S.Ct. 580, 586, 11 L.Ed.2d 559 (1964).

The Court of Appeals for the Second Circuit has likewise held that deportation is a penalty that "in [its] severity ... surpasses all but the most Draconian criminal penalties." *Lennon v. Immigration and Naturalization Service,* 527 F.2d 187, 193 (2d Cir.1975); *Lok v. Immigration and Naturalization Service,* 548 F.2d 37, 39 (2d Cir. 1977). "Everyone knows that to be forcibly taken away from home, and family, and

friends, and business, and property, and sent across the ocean to a distant land, is punishment; and that oftentimes most severe and cruel." *Fong Yue Ting v. United States,* 149 U.S. 698, 740, 13 S.Ct. 1016, 1032, 37 L.Ed. 905 (1893) (Brewer, J., dissenting).[6]

Perhaps the most eloquent words on this subject are those of James Madison, which are quoted in Justice Field's extraordinary dissenting opinion in *Fong Yue Ting:*

> If the banishment of an alien from a country into which he has been invited as the asylum most auspicious to his happiness—a country where he may have formed the most tender connections; where he may have invested his entire property, and acquired property of the real and permanent as well as the movable and temporary kind; where he enjoys, under the laws, a greater share of the blessings of personal security and personal liberty, than he can elsewhere hope for; ... if a banishment of this sort be not a punishment, and among the severest of punishments, it would be difficult to imagine a doom to which the name can be applied.

*Id.* at 749, 13 S.Ct. at 1036 (Field, J., dissenting) (quoting 4 Elliot's Deb. 554, 555).

A downward departure that would mitigate a sentence to which the "severest of punishments" attaches is plainly appropriate, even if it would be justified in a large number of cases. The United States Attorney, however, has not cited any evidence to suggest that such a departure would affect an extraordinarily large number of defendants. The Sentencing Commission tells us that 23%, or less than one out of four, of the defendants sentenced in 1991 under the

---

**5.** A similar distinction was drawn by Senator Kennedy in the colloquy cited earlier in the text. *See* 133 Cong.Rec. S16648 (daily ed. Nov. 20, 1987).

**6.** The majority opinion in *Fong Yue Ting v. United States,* 149 U.S. 698, 13 S.Ct. 1016, 37 L.Ed. 905 (1893), upon which the United States Attorney relies, is a shameful example of the Supreme Court's unwillingness to restrict the power of Congress to do with aliens as it chooses. Nevertheless, it can fairly be said that the

blatantly racist scheme which the Supreme Court upheld there could not survive today, and that much of the language discounting the severity of the penalty of deportation, *id.* at 730–31, 13 S.Ct. at 1029, has been rejected in subsequent cases. Indeed, the words of Justice Brewer's dissent, which are quoted in the text above, are echoed in cases such as *Galvan v. Press,* 347 U.S. at 522, 74 S.Ct. at 737, and *Gastelum–Quinones v. Kennedy,* 374 U.S. at 479, 83 S.Ct. at 1825.

Sentencing Guidelines were aliens. United States Sentencing Commission, 1991 Annual Report 50 (1992). Of that group, a large and unspecified number were illegal aliens for many of whom deportation was a welcome, free trip home.

A distinction should be made between aliens who are in the country wrongfully (and for whom deportation, although a hardship, is a legal restoration to a preexisting status) and those whose original entry was lawful. For the latter the punishment for a crime is not the same as the one imposed on the nonalien who has committed the same act.

Sol Rubin, *The Law of Criminal Conviction* § 15, at 632 (1963). Notwithstanding the importance of this difference, we do not know how many defendants are permanent resident aliens.

■ More significantly, it does not necessarily follow that a downward departure would be appropriate in every case involving a resident alien who is subject to deportation. A decision whether to depart, as well as the extent of the departure, must necessarily be guided by the command of Congress that the sentence "be sufficient, but not greater than necessary" to accomplish the purposes set out in 18 U.S.C. § 3553(a).

[E]ven though the judge finds an aggravating or mitigating circumstance in the case that was not adequately considered in the formulation of the guidelines, the judge might conclude that the circumstance does not justify a sentence outside the guidelines. Instead, he might conclude that a sentence at the upper end of the range in the guidelines for an aggravating circumstance, or at the lower end of the range for a mitigating circumstance, was more appropriate or that the circumstance should not affect the sentence at all.

S.Rep. No. 225, 98th Cong., 1st Sess. 79 (1983), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3262. Accordingly, even if deportation or disparate treatment by the Bureau of Prisons could provide a basis for a downward departure, other circumstances may militate against it.

■ I choose to depart downwardly in this case because there are no aggravating circumstances present and because other mitigating factors warrant a sentence at the low end of the guideline range. Specifically, subject to adjustment for the defendant's minimal role in the offense and his acceptance of responsibility, the guideline range of 41–51 months is based solely on the quantity of the substance containing heroin that he imported. The range covers quantities from 400 to 700 grams. Although the quantity of the substance the defendant attempted to import, 562.5 grams, lies in the middle of the guideline range, the purity of the substance was only 28%, which is low in comparison to similar cases. *See* United States Department of Justice, Drug Enforcement Administration, Illegal Drug Price/Purity Report: United States Calendar Years 1988 through 1991 3 (1992); Gov't's Supp.App.Ex. H; Drug Enforcement Administration, Office of Intelligence, Heroin Signature Program Fact Sheet (1988–1991); Gov't's Supp.App.Ex. I.

Contrary to the argument of the United States Attorney, the Sentencing Commission has not "rejected low purity as a relevant sentencing consideration." Gov't's Corrected Mem of Law at 6. While the Sentencing Commission has noted that "unusually high purity may warrant an upward departure," U.S.S.G. § 2D1.1, comment. (n. 9), it did not provide for a corresponding reduction for low purity because the focus of its commentary was retail dealers who deal in drugs of low purity. As Judge Posner has observed, "[d]rugs are usually consumed, and therefore often sold, in a diluted form, and the adoption by Congress [and the Sentencing Commission] of the 'mixture or substance' method of grading punishment reflected a conscious decision to mete out heavy punishment to large retail dealers, who are likely to possess 'substantial street quantities,' which is to say quantities of the diluted drug ready for sale. H.R.Rep. No. 845, 99th Cong., 2d Sess. 11–12 (1986)." *United States v. Marshall*, 908 F.2d 1312, 1331 (7th Cir.1990) (Posner, J., dissenting), *aff'd sub nom, Chapman v. United States*, —— U.S. ——, 111 S.Ct. 1919, 114 L.Ed.2d 524 (1991).

Congress and the Sentencing Commission "did not want to punish retail traffickers less severely, even though they deal in smaller quantities of the pure drug, because such traffickers keep the street markets going." *Chapman v. United States,* — U.S. —, 111 S.Ct. 1919, 1925, 114 L.Ed.2d 524 (1991).

Accordingly, a downward departure based on low purity would make no sense in cases involving retail drug traffickers, although an upward adjustment for unusually high purity may be appropriate. "Since controlled substances are often diluted and combined with other substances as they pass down the chain of distribution, the fact that a defendant is in possession of unusually pure narcotics may indicate a prominent role in the criminal enterprise and proximity to the source of the drugs." U.S.S.G. § 2D1.1, comment. (n. 9).

These assumptions have no validity with respect to the crime of importing controlled substances. Because the cost and risk of importing drugs are the same regardless of the purity, and because the potential profit increases in proportion to the purity, drugs imported into the United States are much purer than the diluted mixtures available for retail sale. Moreover, defendants like Mr. Restrepo, who smuggle drugs into the United States inside their stomachs, are low-level players. Even when they are found with drugs which are over 90% pure, the high level of purity "in no way reflects their position in the distribution chain." Gov't's Corrected Mem. of Law at 7–8. Under such circumstances, a departure based on unusually low drug purity does not undermine an enforcement policy directed at retail traffickers, or at those in "a high place in the processing and distribution chain," H.R.Rep. No. 845, 99th Cong., 2d Sess. 12 (1986), and is rationally related to the potential harm that the defendant's conduct threatened.

Whether 28% purity is sufficiently unusual in the importation context to warrant a downward departure is a question that can be answered only after an evidentiary hearing.[7] Nevertheless, it is surely absurd to argue that low purity is not "a relevant sentencing consideration" and that this defendant should receive the same sentence as a defendant who imports a substance of equal weight which is three times the purity and which may service up to three times the number of addicts. *See United States v. Serrano–Covaleda,* No. 92 CR 347 (E.D.N.Y.) (defendant who imported 635.5 grams of a substance containing 92% heroin faces 41–51 month guideline sentence— the same as Mr. Restrepo).

Another factor that supports a sentence at the low end of the guideline range is the timely notification by the defendant of his intent to enter a plea of guilty, "thereby permitting the government to avoid preparing for trial and permitting the court to allocate its resources efficiently." 57 Fed. Reg. 20,156 (1992) (amendment of U.S.S.G. § 3E1.1, effective November 1, 1992). Under the proposed amendment to U.S.S.G. § 3E1.1, timely notification of an intent to plead guilty would provide a basis for a one-level reduction in the offense level, which would be equal to four months here. While this amendment does not take effect until November 1, 1992, and while there may be a basis to downwardly depart on this ground even without the formal amendment of section 3E1.1, *cf. United States v. Garcia,* 926 F.2d 125 (2d Cir. 1991), there can be little doubt that it is a mitigating factor to be weighed in determining a sentence within the guideline range.[8]

---

7. Because the Sentencing Commission chose to peg the base level of drug offenses to quantity rather than purity, U.S.S.G. § 2D1.1, comment. (n. 1), a downward departure based on purity would only be warranted in cases in which the purity level was unusually low. *See United States v. Marshall,* 908 F.2d 1312, 1324 (7th Cir.1990), *aff'd sub nom., Chapman v. United States,* — U.S. —, 111 S.Ct. 1919, 114 L.Ed.2d 524 (1991).

8. Section 3E1.1 of the Sentencing Guidelines, which provides for a two level reduction in the offense level for acceptance of responsibility, does not take into account the special benefit to the judicial processing of criminal cases derived from a timely plea of guilty. Indeed, a guilty plea does not guarantee such a reduction, U.S.S.G. § 3E1.1(c); *United States v. Irabor,* 894 F.2d 554, 556–57 (2d Cir.1990), nor does going

Because of the quantity of the drug, its relatively low level of purity, the defendant's timely plea of guilty, and the absence of any aggravating factors, a sentence of 41 months—the bottom of the guideline range—would be appropriate here. Of course, as already noted, the defendant faces an extraordinarily severe penalty in addition to incarceration for a longer period of time and under far more difficult circumstances than those generally faced by a United States citizen who committed the same offense. A sentence at the low end of the applicable guideline range does not adequately take account of this additional penalty. Accordingly, some downward departure is necessary in order to impose a sentence that is not "unreasonably harsh under all the circumstances of the case." S.Rep. No. 225, 98th Cong. 1st Sess., 76 (1983), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3259.

▆▆ The difficulty, of course, is in divining a number, in months or years, that corresponds to the collateral penalty petitioner faces. The fact that "there are inherent difficulties in any attempt at calibration," however, does not provide a reason for not departing. *United States v. Pergola*, 930 F.2d 216, 220 (2d Cir.1991). Nor does the fact that it is not certain whether, even if he had been a United States citizen, the defendant would have been offered the privilege of serving 10% of his sentence in a halfway house or in home confinement. The factual predicate for a departure from the guidelines need not be established with certainty. *United States v. Nichols*, 912 F.2d 598, 603 (2d Cir.1990). Here, 18

U.S.C. § 3624(c) requires the Bureau of Prisons to assure, "to the extent practicable," that every prisoner spend a "reasonable part" of the last 10% of his sentence, not to exceed six months, in some type of community confinement, and the United States Attorney has not suggested a specific reason why the defendant would have been denied the benefit prescribed by section 3624(c) if he were a United States citizen.[9]

Under the circumstances here, a two point reduction in the offense level, which translates into a sentence up to eight months less than the defendant otherwise would face, plus the forfeiture of his status as a resident alien and deportation, is appropriate. If the guideline range represents "a sentence sufficient, but not greater than necessary" to effectuate the purposes of providing just punishment, deterring future misconduct and protecting the public from further crimes of this defendant, the combined punishment of 41–51 months plus deportation is far more severe than necessary.

On the other hand, a departure greater than a two point reduction in the offense level is not warranted. Aside from the considerations otherwise relevant, any greater departure would involve overriding the wishes of Congress and the Executive Branch to a greater extent than is appropriate. The departure brings the sentence down to thirty-three months, which is almost half of the mandatory five-year sentence prescribed by Congress. The United States Attorney, who has adopted a plea bargaining policy that allows a sentence to

to trial preclude it, U.S.S.G. § 3E1.1(b); *United States v. Fleener*, 900 F.2d 914 (9th Cir.1990).

**9.** During the first quarter of 1992, approximately two-thirds of the prisoners who served their sentence in a minimum security facility were released through a halfway house. *See* Bureau of Prisons, CCC Utilization Report (January–March 1992); Gov't's Supp.App.Ex. K. The statistics relating to such prisoners are far more reliable as a measure of probability than the statistics cited by the United States Attorney showing that, during the same period, less than half of *all* prisoners received the benefit of serving a portion of the last 10% of their sentence in a halfway house. *See* Letter from Julie

E. Katzman, Assistant United States Attorney, dated July 15, 1992, at 3 n. 5. This figure is misleading because, as discussed earlier, a substantial number of all prisoners may be ineligible for minimum security or community confinement by virtue of the nature of the crimes they have committed or due to their status as deportable aliens. *See* Department of Justice, Immigration and Naturalization Service, Immigration Act of 1990: Report on Aliens 5 (1992); Gov't's App.Ex. E (25% of federal prison population is foreign born); United States Sentencing Commission, 1991 Annual Report 50 (1992) (23% of all defendants sentenced under the guidelines were aliens).

be imposed pursuant to the Sentencing Guidelines and below the five-year mandatory minimum, opposes any downward departure. While the grounds upon which he bases his opposition are without merit, it must be recognized that extreme departures from the Sentencing Guidelines over his objection can only have the effect of hardening an otherwise responsible and commendable exercise of his discretion. Accordingly, it is my intention to depart downwardly to a guideline level of twenty, and impose a sentence of thirty-three months.

SO ORDERED.