**Merlvyn C. IHEME, Petitioner,**

v.

**Janet RENO, Attorney General of the United States of America and Nancy J. Hooks, Officer In Charge Immigration and Naturalization Service, Oakdale, Louisiana, Respondents.**

No. 93 CV 1595 (ERK).

United States District Court,
E.D. New York.

April 27, 1993.

Merlvyn C. Iheme, petitioner pro se.

Mary Jo White, U.S. Atty., E.D.N.Y. by Jason Brown, Asst. U.S. Atty., Brooklyn, NY, for respondents.

## MEMORANDUM & ORDER

KORMAN, District Judge.

This case involves another outrageous example of the treatment of a deportable alien similar to that involved in the three consolidated cases filed under the caption of *Nwankwo v. Reno,* 819 F.Supp. 1186 (E.D.N.Y.1993). On October 2, 1991, the defendant was arrested at John F. Kennedy Airport while attempting to import approxi-

mately 520 grams of a substance of which 7.4% was 6–monoacetylmorphine. On July 31, 1992, the defendant was sentenced to fifteen months imprisonment, 3 years supervised release and a $50 special assessment.

On April 9, 1993, some five months after he completed his fifteen month sentence, the defendant was still incarcerated at the Federal Correctional Institution at Oakdale, Louisiana. In a letter, Mr. Iheme sought an order directing his deportation:

> "I want to bring to your notice of my continued incarceration after serving my time for the offense committed. You sentenced me to a period of 15 months and 3 yrs. probation for importing Mono acetyl morphine with purity level of 7.4% on the 31st of July, 1992, on or about 2:30 p.m. I finish my sentence on the Nov. 2nd, 1992. On the Oct. 27, I was brought to Oakdale, Louisiana for deportation, since then I've been ordered deportable by Judge Johnson Duck Jr. However, this is my fifth month now still waiting for deportation to no avail, only told that my travelling documents are not ready.
>
> Most important, I am a legal resident with two kids and a wife to take care of and now he wants to separate these kids from their father in the name of deportation. I honestly think that I've learnt some thing for this time period incarcerated and vowed to abstain from crime. As at the time of my writing, the Immigration and Naturalization Service, do neither want to deport me nor release me so I can be with these kids of ages one and six.
>
> Your Honor, kindly use your office to see that justice is done. I respectfully awaits to hear from you."

The letter was treated as a *pro se* petition for a writ of habeas corpus. On April 12, 1993, the United States Attorney was directed to respond to it.

In a response filed April 16, 1993, the United States Attorney confirmed the essential details of Mr. Iheme's *pro se* submission:

> "The defendant completed his federal sentence on November 2, 1992, at which time he was transferred to the custody of the Immigration and Naturalization Service

("INS") at the Federal Deportation Center in Oakdale, Louisiana. On January 11, 1993, Immigration Judge John A. Duck, Jr. issued an order declaring Iheme deportable. Iheme did not appeal that order, which became final on January 22, 1993. By letter dated January 29, 1993, INS formally requested that the Embassy of Nigeria issue travel documents for Iheme so that he could be deported. By letter dated April 5, 1993, INS forwarded Iheme's original passport to the Embassy of Nigeria and renewed its request for issuance of the requisite travel documents. On April 13, 1993, the Nigerian government approved Iheme for repatriation and advised INS that it will need approximately fourteen days to issue Iheme's travel documents. Accordingly, INS anticipates that Iheme will be deported by the end of April."

The conduct of the Immigration and Naturalization Service, as described in the letter of the United States Attorney, is disgraceful. Section 701 of the Immigration Reform and Control Act of 1986 provides:

> In the case of an alien who is convicted of an offense which makes the alien subject to deportation, the Attorney General shall begin any deportation proceeding as expeditiously as possible after the date of the conviction.

8 U.S.C. § 1252(i).

In *Soler v. Scott,* 942 F.2d 597, 600 (9th Cir.1991), *vacated as moot,* —— U.S. ——, 113 S.Ct. 454, 121 L.Ed.2d 364 (1992), Judge Browning set out concisely the "single objective" that Congress sought to accomplish by the enactment of Section 701:

> Congress enacted Section 701 ... to require the INS to abandon its practice of postponing prisoner deportation hearings until after the expiration of a prisoner's sentence. Rather than deporting aliens promptly upon the expiration of their prison sentence, the INS waited until a prisoner completed his or her sentence before

even scheduling a hearing to determine whether the prisoner would be deported. These aliens remained in prison while awaiting their deportation hearing. Congress concluded this practice of keeping aliens in prison after they had completed their sentence contributed to prison overcrowding and imposed an unfair, unnecessary and expensive burden on limited federal and state resources. Congress enacted Section 701 to require the INS to begin deportation hearings as soon as possible after conviction so the question of deportation could be resolved before the prisoner's term expired, and if the prisoner was found deportable, deportation could be accomplished promptly.

■ Section 701 was not complied with here, just as it has been ignored by the Immigration and Naturalization Service in many other cases. *Soler,* 942 F.2d at 600–601. This non-compliance is the fault largely of the Department of Justice which has taken the position consistently that Section 701 is simply precatory in nature and is not subject to judicial enforcement. This argument, which has been made with considerable force and success,[1] has eliminated any incentive the Immigration and Naturalization Service had to comply with the congressional mandate. Indeed, the reply to the *pro se* petition here does not offer any explanation for the failure of the Immigration and Naturalization Service to conduct the deportation proceedings prior to the expiration of Mr. Iheme's sentence as Congress intended.

This is not the only questionable conduct that the response of the United States Attorney glosses over. Mr. Iheme has now been incarcerated for over three months since a final order of deportation was entered. Although the Attorney General is given six months from the date of a final order of deportation within which to effect the departure of an alien from the United States, the Attorney General may not exercise her discretion to continue to incarcerate the alien

---

1. *Giddings v. Chandler,* 979 F.2d 1104 (5th Cir. 1992); *Aguirre v. Meese,* 930 F.2d 1292 (7th Cir.1991); *Prieto v. Gluch,* 913 F.2d 1159 (6th Cir.1990), *cert. denied,* 498 U.S. 1092, 111 S.Ct. 976, 112 L.Ed.2d 1061 (1991); *Orozco v. United States Immigration and Naturalization Service,*

911 F.2d 539 (11th Cir.1990); *Gonzalez v. United States Immigration and Naturalization Service,* 867 F.2d 1108 (8th Cir.1989); *Lartey v. United States Department of Justice,* 790 F.Supp. 130 (W.D.La.1992); *Cabezas v. Scott,* 717 F.Supp. 696 (D.Ariz.1989). *Contra Soler v. Scott,* 942

unless she acts "with such reasonable dispatch as may be warranted by the particular circumstances in the case of any alien to effect such alien's departure from the United States within such six-month period." 8 U.S.C. § 1252(c); *Nwankwo v. Reno,* 819 F.Supp. 1186. The response of the United States Attorney, however, fails to explain why Mr. Iheme has not been deported since the entry of the order of deportation some three months ago.

The United States Attorney does imply that a timely request for the issuance of travel documents was made to the Nigerian Embassy on January 11, 1993 seven days after the order of deportation became final. The request did not, however, include the passport of Mr. Iheme that the Nigerian Embassy requires before it will issue the necessary travel documents for the alien to return to Nigeria. Although the Immigration and Naturalization Service is aware that "[t]he Embassy of Nigeria requires this Service to present passports, including documents and other biographical data to assist the Embassy in verifying the subject's identity," [2] Mr. Iheme's passport was not forwarded to the Nigerian Embassy until April 5, 1993.

The United States Attorney does not offer any explanation for this delay in forwarding the passport. Prior experience, however, suggests that it was probably due to the failure of the Drug Enforcement Administration to forward Mr. Iheme's passport to the Immigration and Naturalization Service. If this is the explanation for the delay, it is simply not adequate. The Immigration and Naturalization Service has long been aware of delays caused by the failure of the Drug Enforcement Administration to forward the necessary travel documents. Indeed, as result of the attention *United States v. Restrepo,* 802 F.Supp. 781 (E.D.N.Y.1992), called to this problem, representatives of the United States Attorneys Office and Billy G. Hammons of the Immigration and Naturalization Service met on November 19, 1992 to discuss steps that would be taken to facilitate and expedite the deportation process for convicted aliens at the conclusion of their sentences. The memorandum, which summarizes the outcome of the meeting and which was provided by the United States Attorney, indicates that the "immediate concern" of the meeting was "the delay occasioned by the inability to promptly locate the aliens' travel documents, which are required by the receiving country." Memorandum from William J. Muller, Chief Criminal Division, United States Attorneys Office, dated February 19, 1993.

While procedures were adopted that are intended to avoid such delays with respect to aliens arrested thereafter, there were no steps taken to avoid the delay encountered here. Nor did the Immigration and Naturalization Service make any effort to obtain Mr. Iheme's passport until more than two months after the order of deportation became final. In the absence of a more compelling explanation for the delay in deporting Mr. Iheme, it is impossible to conclude that the Attorney General has acted "with such reasonable dispatch as may be warranted by the particular circumstances ... to effect such alien's departure from the United States." 8 U.S.C. § 1252(c). *See United States v. Nwankwo,* 819 F.Supp. 1186.

The apparent misconduct of the Immigration and Naturalization Service has not only prejudiced the petitioner, it has cost the taxpayers of the United States approximately $2,000 per month for each month Mr. Iheme has served beyond his original fifteen month sentence.[3] Instead of acquiescing in the issuance of the writ of habeas corpus, which the United States Attorney has conceded would be appropriate if "a particular defendant is detained past his term of incarceration because of Immigration and Naturalization Service non-feasance," Brief for the United States, *United States v. Restrepo,* No.

---

F.2d 597 (9th Cir.1991), *vacated as moot,* —— U.S. ——, 113 S.Ct. 454, 121 L.Ed.2d 364 (1991).

**2.** Letter of Nancy L. Hooks, Office-in-Charge, Immigration and Naturalization Service, Oakdale, Louisiana dated March 26, 1993.

**3.** The average monthly per capita cost of incarcerating a prisoner in a federal prison facility is $1492. Administrative Office Memorandum, "Costs of Incarceration and Supervision," April 7, 1991. I am advised informally that the cost of confining a prisoner at the Federal Correctional Institution at Oakdale, Louisiana is $2,000 per month.

92–1631, 2d Cir., p. 32, the United States Attorney continues to aid and abet the Immigration and Naturalization Service in delaying Mr. Iheme's deportation.

 Specifically, the United States Attorney objects to my consideration of the petition on the ground that "a district court may not entertain a habeas corpus action unless it. has jurisdiction over the custodian of the prisoner." While this is a correct statement of the law, it is difficult to understand the decision of the United States Attorney to rely on it here. The purpose of the rule requiring that the habeas corpus court have jurisdiction over the custodian of the prisoner is to avoid placing the burden on the custodian of transporting the prisoner to a district court far from his place of confinement. *Braden v. 30th Judicial Circuit Court of Kentucky*, 410 U.S. 484, 496, 93 S.Ct. 1123, 1130, 35 L.Ed.2d 443 (1973). Because the facts are not disputed, there will be no need to move the prisoner to New York for a hearing. Moreover, the United States District Court for the Western District of Louisiana, where petitioner and hundreds like him are detained, is "inundated" with habeas corpus petitions based on allegations similar to those alleged here and is unable to process these petitions in a timely manner. *See Emejulu v. United States Immigration and Naturalization Service*, 989 F.2d 771 (5th Cir.1993) ("[T]he administrative delays in processing deportations produces an atypical and unanticipated volume of habeas corpus petitions that is beyond the capability of the district court [for the Western District of Louisiana] to process in a timely fashion." *Id.* at 772).

 The jurisdictional defense asserted by the United States Attorney is one that can be waived. *See Nwankwo v. Reno*, 819 F.Supp. 1186 (E.D.N.Y.1993). Indeed, in *United States v. Huss*, 520 F.2d 598 (2d Cir.1975), the Court of Appeals indicated that it was "disturbed that in the interest of justice the United States Attorney" could not waive an objection similar to the one raised here. *Id.* at 606 n. 16. While I share the same sentiment, the unwillingness of the United States Attorney to waive this objection requires me

to transfer the case to the United States District Court for the Western District of Louisiana (Lake Charles Division). Subject to any order of the judge to whom the case is assigned, the United States Attorney for the Western District of Louisiana is directed to show cause why the petitioner should not be released by April 30, 1993, unless he is deported prior thereto.

SO ORDERED.