UNITED STATES of America, Appellant,

v.

**Jorge RESTREPO, Defendant–Appellee.**

**No. 1065, Docket 92–1631.**

United States Court of Appeals,
Second Circuit.

Argued March 9, 1993.

Decided July 23, 1993.

Julie E. Katzman, Asst. U.S. Atty., Brooklyn, NY (Mary Jo White, U.S. Atty., E.D.N.Y., David C. James, Asst. U.S. Atty., Brooklyn, NY, on the brief), for appellant.

Robert C. Dorf, New York City for defendant-appellee.

Robert A. Culp, New York City (Lory Rosenberg, American Immigration Law Foundation Legal Action Center, Washington, DC, Robert Juceam, Fried, Frank, Harris, Shriver & Jacobson, New York City, of counsel), for amici curiae American Immigration Law Foundation Legal Action Center and Nat. Immigration Project of the Nat. Lawyers Guild.

Before: TIMBERS, KEARSE, and PRATT, Circuit Judges.

KEARSE, Circuit Judge:

The United States appeals from a final judgment of the United States District Court for the Eastern District of New York, Edward R. Korman, Judge, convicting defendant Jorge Restrepo, following his plea of guilty, on one count of importing heroin in violation of 21 U.S.C. § 952(a) (1988), and sentencing him principally to 33 months' imprisonment, to be followed by three years' supervised release. The district court imposed this sentence in a downward departure from the range prescribed by the federal Sentencing Guidelines ("Guidelines"), ruling that such a departure was warranted because Restrepo, as an alien, would be deported and would suffer other collateral consequences not suffered by United States citizens. On appeal, the government contends that this was not a permissible basis for departure. For the reasons below, we agree and vacate the judgment.

## I. BACKGROUND

Restrepo, who is married to a United States citizen with whom he has had three children, is a conditional permanent resident alien of the United States. A native of Colombia, he entered the United States illegally in 1985. He became a lawful United States resident on March 8, 1991, approximately one year after his marriage, when the Immigration and Naturalization Service ("INS") granted him his present status. In addition to his wife and three children, Restrepo has several siblings who reside in the United States.

On November 20, 1991, Restrepo flew from Bogota, Colombia, to John F. Kennedy International Airport in New York City. Upon his arrival in New York, a United States Customs Service ("Customs") agent interviewed Restrepo and thought that he appeared nervous and that his answers to routine questions seemed evasive. The agent therefore asked Restrepo if he would submit to an X-ray examination. Restrepo consent-

ed, and the examination revealed the presence of foreign materials in his digestive system. Customs agents placed Restrepo under arrest; he thereafter passed some 82 balloons that contained 562.5 grams of a substance that was 28% heroin.

Restrepo was indicted on one count of importation of heroin, in violation of 21 U.S.C. § 952(a), *id.* § 960(a)(1) (1988), and *id.* § 960(b)(2)(A) (1988 & Supp. II 1990); and one count of possession of heroin, in violation of 21 U.S.C. § 841(a)(1) (1988), and *id.* § 841(b)(1)(B)(i) (1988 & Supp. II 1990). Pursuant to a plea agreement, he pleaded guilty to the importation count in full satisfaction of the charges against him. The agreement estimated that Restrepo's likely total offense level under the Guidelines would be 26, which, assuming he had no prior convictions, would have resulted in an imprisonment range of 63–78 months. The agreement also stated that "[t]his estimate is not binding on the Court or on the parties, and if the appropriate Guideline offense level as determined by the Court is different, the defendant will not be entitled to withdraw the plea." In addition, Restrepo agreed not to move for a downward departure from the applicable sentencing guideline range; the government agreed not to move for an upward departure from that range.

The Probation Department's Presentence Report ("PSR") prepared on Restrepo calculated his base offense level as 28. *See* Guidelines § 2D1.1(c)(8). It recommended decreasing the offense level by six steps to 22, based in part on Restrepo's minimal role in the activity, *see* Guidelines § 3B1.2(a) (four steps), and in part on his acceptance of responsibility, *see* Guidelines § 3E1.1(a) (two steps). Since Restrepo had no known prior criminal record, his criminal history category was I, which resulted in a prescribed imprisonment range under the Guidelines of 41–51 months.

At a sentencing hearing held on June 12, 1992, the district court announced *sua sponte* that it believed "[t]here [we]re several grounds here for a potential downward departure," (Sentencing Transcript, June 12, 1992 ("Tr."), at 4), including the "unusually low" purity of the heroin Restrepo was carrying *(id.)*, a then-proposed amendment to Guidelines § 3E1.1 (eff. Nov. 1, 1992) to decrease a defendant's offense level by one for timely notification of an intention to plead guilty *(see* Tr. at 5), and the fact that Restrepo would "suffer a collateral consequence, a significant collateral consequence, as a result of this sentence because he's a permanent resident alien" *(id.* at 29). The court indicated that any such departure would not exceed two offense levels. The government objected to the proposed departure and requested an opportunity to present its position in writing.

After receiving the government's written opposition, the district court, in an opinion dated August 17, 1992, and reported at 802 F.Supp. 781, stated its intention to depart downward by two offense levels based solely on the collateral consequences Restrepo would face due to his status as a permanent resident alien. The court found that Restrepo would suffer three principal consequences that the court viewed as being as punitive as an additional term of incarceration. First, a resident alien convicted of a narcotics offense must be deported unless he is eligible for discretionary relief from deportation. Since Restrepo could not meet even the most lenient of the statutory requirements for obtaining such relief, the court found that "for the crime that he committed, Mr. Restrepo will be punished with 'a life sentence of banishment in addition to the punishment which a citizen would suffer for the identical acts.'" *Id.* at 783 (quoting *Jordan v. De George,* 341 U.S. 223, 232, 71 S.Ct. 703, 708, 95 L.Ed. 886 (1951) (Jackson, J., dissenting)).

Second, the court found that due to a policy of the Bureau of Prisons (hereinafter sometimes the "Bureau"), "solely because of his status as a deportable alien, the defendant's sentence will be served under circumstances that are more severe than those facing a United States citizen under similar circumstances." 802 F.Supp. at 783. Under that policy, Restrepo, as a deportable alien, would receive a "Public Security Factor" designation, *see* Bureau of Prisons, *Program Statement 5100.4: Security Designation and Custody Classification Manual* 7 (1992), that would render him ineligible (a) to serve his sentence in a minimal security facility, and

(b) to serve a part of the last 10% of his sentence in a community custody program such as a halfway house or home confinement.

Third, because Restrepo is a deportable alien, the INS will file a detainer with the Bureau of Prisons some time prior to the end of his prison sentence. The filing of the detainer could result in Restrepo's being incarcerated in an INS facility for an additional period while awaiting the completion of deportation proceedings. Relying on a government report, United States General Accounting Office, *Immigration Control: Immigration Policies Affect INS Detention Efforts* 26 (1992), the district court found that the average length of time criminal aliens were detained in INS facilities beyond the end of their period of imprisonment was 59 days. 802 F.Supp. at 784. The court thus presumed that Restrepo would likewise be incarcerated "for a longer period of time and under far more difficult circumstances than those generally faced by a United States citizen who committed the same offense." *Id.* at 793.

The district court concluded that "[e]ven if deportation is reasonable and the disparate treatment is justified, this does not change the fact that for a resident alien who is convicted of a drug-related offense, 'the punishment for a crime is not the same as the one imposed on [a] nonalien who has committed the same act.'" *Id.* at 785 (quoting S. Rubin, *The Law of Criminal Corrections* § 15, at 632 (1963)). In Restrepo's circumstances, the court found that a two-step reduction in offense level, "which translates into a sentence up to eight months less than the defendant otherwise would face, plus the forfeiture of his status as a resident alien and deportation," would be appropriate. 802 F.Supp. at 793. Accordingly, seeking "to impose a sentence that [wa]s not 'unreasonably harsh under all the circumstances of the case,'" *Id.* (quoting S.Rep. No. 225, 98th Cong., 1st Sess. 76 (1983), *reprinted in* 1984 U.S.Code Cong. & Admin.News 3182, 3259), the district court departed downward two offense levels.

A judgment was eventually entered, sentencing Restrepo principally to 33 months' imprisonment, rather than the 41–51 months prescribed by the Guidelines.

## II. DISCUSSION

On appeal, the government contends principally (A) that a defendant's status as an alien cannot serve as the basis for a downward departure, and (B) that if that status can warrant such a departure, the facts did not warrant a departure here. We agree with the latter contention.

### A. *Whether Alienage May Ever Be Considered*

The government argues that the Guidelines themselves expressly forbid consideration of alienage as a basis for departure because they state that a defendant's national origin is not relevant to the determination of a defendant's sentence, *see* Guidelines § 5H1.10 Policy Statement. We find this argument unpersuasive.

Preliminarily, we note that both the Guidelines and the Sentencing Reform Act allow the "sentencing court [to] impose a sentence outside the range established by the applicable guideline, if the court finds 'that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described.'" Guidelines § 5K2.0 Policy Statement (quoting 18 U.S.C. § 3553(b) (1988)). We have "increasingly recognized the importance of departure by reason of offender characteristics for the fair fulfillment of the sentencing scheme prescribed by the Sentencing Reform Act and the Sentencing Guidelines." *United States v. Merritt,* 988 F.2d 1298, 1309 (2d Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 2933, 124 L.Ed.2d 683 (1993).

Thus, though certain Guidelines provisions state that certain defendant characteristics "are not ordinarily relevant" to a departure determination, *see, e.g.,* Guidelines § 5H1.3 Policy Statement (mental and emotional conditions); *id.* § 5H1.4 Policy Statement (physical condition or appearance, including physique); *id.* § 5H1.6 Policy Statement (family

ties and responsibilities), this does not necessarily mean that that characteristic is never relevant, *see United States v. Johnson,* 964 F.2d 124, 128–29 (2d Cir.1992). We have reasoned that "[i]f the Commission had intended an absolute rule that [particular] circumstances may never be taken into account in any way, it would have said so," *id.* at 129, and we have on more than one occasion upheld a departure based on a characteristic that is not "ordinarily" relevant where the consequences of that characteristic were present to an extreme outside the "heartland" of cases, *see, e.g., United States v. Mickens,* 977 F.2d 69, 73 (2d Cir.1992) (emotional condition); *United States v. Maier,* 975 F.2d 944, 948 (2d Cir.1992) (drug rehabilitation); *United States v. Johnson,* 964 F.2d at 129–30 (family circumstances); *United States v. Gonzalez,* 945 F.2d 525, 526–27 (2d Cir. 1991) (physical appearance); *cf. United States v. Concepcion,* 983 F.2d 369, 389 (2d Cir.1992) (though use of Guidelines' cross-reference was intended by Commission, cross-reference had an effect to a degree not considered by Commission, thereby giving district court power to depart downward), *petition for cert. filed* (U.S. June 23, 1993).

■ Turning to the matter of alienage, we note that the Guidelines state unqualifiedly that "national origin" is "not relevant in sentencing determinations." Guidelines § 5H1.10 Policy Statement. National origin, *i.e.,* having been born in a particular country, however, is not synonymous with "alienage," *i.e.,* simply not being a citizen of the country in which one is present. *See, e.g.,* Webster's Third New International Dictionary 53 (1976). Thus, the prohibition against consideration of national origin does not constitute a prohibition against consideration of alienage. Nor do we see any reason why it should. We think it difficult to envision any penological pertinence of the fact that a defendant was born in a particular foreign country. The fact that a defendant is not a United States citizen, on the other hand, potentially has logical relevance to his treatment upon conviction, for Congress, which has broad powers to establish principles governing an alien's right to remain in the United States, *see Fiallo v. Bell,* 430 U.S. 787, 792, 97 S.Ct. 1473, 1477, 52 L.Ed.2d 50 (1977); *Galvan v. Press,* 347 U.S. 522, 530–31, 74 S.Ct. 737, 742, 98 L.Ed. 911 (1954), has decreed that certain types of offenses require an alien's deportation.

The Guidelines do not expressly bar consideration of alienage. Indeed, with respect to certain immigration or passport offenses, a sentencing court is expressly directed by the Guidelines to take into account the defendant's alienage. *See, e.g.,* Guidelines § 2L1.1(b)(3) (prescribing eight-step increase in offense level where, *inter alia,* "defendant is an unlawful alien"); *id.* § 2L2.2(b)(1) (same except prescribing two-step increase); *id.* § 2L2.4(b)(1) (same). We thus see nothing in the Guidelines themselves that automatically excludes a downward departure on the ground of a defendant's alienage.

The government also argues that alienage cannot be deemed a factor of a kind, or to a degree, not adequately taken into consideration by the Commission because alienage is a characteristic shared by a large part of the "heartland" of cases considered by the Sentencing Commission in formulating the Guidelines. We agree that, to the extent that alienage is a characteristic shared by a large number of persons subject to the Guidelines, it is a characteristic that, for sentencing purposes, is not "ordinarily relevant." It remains, however, a characteristic that may be considered if a sentencing court finds that its effect is beyond the ordinary.

In sum, we decline to rule that pertinent collateral consequences of a defendant's alienage could not serve as a valid basis for departure if those consequences were extraordinary in nature or degree. Resolution of that question, however, is unnecessary to this appeal, for we conclude that none of the bases relied on by the district court, *i.e.,* (1) the unavailability of preferred conditions of confinement, (2) the possibility of an additional period of detention pending deportation following the completion of sentence, and (3) the effect of deportation as banishment from the United States and separation from family, justified the departure.

### B. *The Collateral Consequences*

#### 1. *Conditions of Confinement*

The Sentencing Reform Act states that once a person has been sentenced to a term

of imprisonment, he or she "shall be committed to the custody of the Bureau of Prisons until the expiration of the term imposed." 18 U.S.C. § 3621(a) (1988). The Bureau is given a great deal of flexibility with respect to the assignment of any prisoner to a correctional facility:

[t]he Bureau of Prisons shall designate the place of the prisoner's imprisonment. *The Bureau may designate any available penal or correctional facility ... that the Bureau determines to be appropriate and suitable,* considering—

(1) the resources of the facility contemplated;

(2) the nature and circumstances of the offense;

(3) the history and characteristics of the prisoner;

(4) any statement by the court that imposed the sentence—

(A) concerning the purposes for which the sentence to imprisonment was determined to be warranted; or

(B) recommending a type of penal or correctional facility as appropriate; and

(5) any pertinent policy statement issued by the Sentencing Commission....

*Id.* § 3621(b) (1988 & Supp. II 1990) (emphasis added).

■ The Sentencing Reform Act also provides that the Bureau "shall, to the extent practicable, assure" that a prisoner spend some portion of the last 10% of the term of imprisonment under conditions that will allow the prisoner to prepare for "re-entry into the community." *Id.* § 3624(c) (1988 & Supp. II 1990). Typically such preparatory reentry confinement involves reassignment to a minimum security facility such as a halfway house. The government states that it is not in fact the Bureau's policy automatically to deny § 3624(c) reassignment to aliens if they can show that they had in the United States (a) at least five years of domicile, (b) strong family and community ties, and (c) a history of stable employment; and that, though Restrepo had not made this showing at the time his PSR was prepared, it was not clear that he would not do so in time to be granted reassignment. Though we,

like the district court, are skeptical of the suggestion that the Bureau would actually reassign Restrepo, a deportable alien who is not eligible for discretionary relief from deportation, to a minimum-security facility, we think it unnecessary to consider the government's suggestion. Even if it were a steadfast policy of the Bureau to deny reassignment to relaxed-security facilities to alien prisoners who must be deported on account of their convictions, we would consider that policy an inappropriate basis for departure from the imprisonment range prescribed by the Guidelines. Assuming that § 3624(c) was intended to apply to deportable aliens, the statute does not on its face require the Bureau to ensure that all prisoners participate in such a program, but only to do so if practicable. For example, the Bureau need not reassign the prisoner to a halfway house if there is no such unit in his home state, and the absence of such a facility has been held to be an impermissible ground for departure from the Guidelines, *United States v. Pozzy,* 902 F.2d 133, 140 (1st Cir.), *cert. denied,* 498 U.S. 943, 111 S.Ct. 353, 112 L.Ed.2d 316 (1990).

More importantly, Congress has directed that upon release from prison, a deportable alien is not to be released back into the community, but must instead, pending deportation, be released to the custody of the Attorney General. *See* 8 U.S.C. § 1252(a)(2)(A) (1988 & Supp. III 1991). Given the focus of § 3624(c) on prisoners who are to reenter the community, it is arguable that Congress, having instructed that deportable aliens not be released into the community, did not mean § 3624(c) to apply to such aliens. Had Congress so stated, a court's disapproval of that policy choice would not be an appropriate basis for a departure from the Guidelines, for the court's attempt to palliate that choice would encroach on the prerogative of the Legislative Branch. Considering the discretion that Congress has confided to the Bureau and the reasonableness of the Bureau's consideration of the fact that the prisoner will be deported following the completion of his term of imprisonment, we think the court's disapproval of the Bureau's exercise of its discretion to deny that prisoner reassignment to a mini-

mum-security facility is likewise an inappropriate basis for departure.

In any event, if there is a defect in the Bureau's policy toward reassignment of deportable aliens, the appropriate way to remedy that defect would be pursuit of an action that challenges such a policy head-on, not the ad hoc granting of departures that have the effect of creating the very type of disparity in sentencing that the adoption of the Guidelines was intended to eliminate.

### 2. *Post–Imprisonment Detention Pending Deportation*

■ The district court noted that the INS normally files a detainer with the Bureau of Prisons during the last month of a deportable alien's imprisonment and that this can result in his being further incarcerated in a deportation detention facility while deportation proceedings are conducted. This additional period of incarceration, the district court found, can average 59 days. Quite apart from the fact that an average delay of 59 days seems a weak basis for the eight-month reduction granted here, we have difficulties with this as a basis for departure.

First, aliens who are to be deported for reasons other than the commission of crimes may be detained pending their deportation. *See* 8 U.S.C. § 1252(a)(1) ("Pending a determination of deportation in the case of any alien ..., such alien may, upon warrant of the Attorney General, be arrested and taken into custody.... [A]ny such alien taken into custody may, in the discretion of the Attorney General and pending such final determination of deportability, (A) be continued in custody; or (B) be released under bond ...; or (C) be released on conditional parole."). Some, albeit not most, aliens who are to be deported for reasons other than conviction of a crime are indeed detained pending deportation. *See* United States General Accounting Office, *Immigration Control: Immigration Policies Affect INS Detention Efforts* 28–29 (1992) ("majority" of such aliens not detained "unless it is determined that they pose a danger to public safety or national security or are likely to abscond"); *see also Wong Wing v. United States,* 163 U.S. 228, 235, 16 S.Ct. 977, 980, 41 L.Ed. 140 (1896) ("Proceed-

ings to ... expel would be vain if those accused could not be held in custody ... while arrangements were being made for their deportation.").

Since a deportable alien may be detained though he has not been convicted of a crime, a detention that occurs pending deportation following a convicted alien's completion of his term of imprisonment should not be viewed as a detention resulting solely from his conviction. Nor should it be viewed as part and parcel of the punishment for his criminal offense. Rather, it is part of a penalty that has traditionally been termed civil rather than punitive, *see, e.g., Abel v. United States,* 362 U.S. 217, 237, 80 S.Ct. 683, 696, 4 L.Ed.2d 668 (1960) (deportation proceedings not subject to the constitutional safeguards that would be required for criminal prosecutions); *United States v. Koziel,* 954 F.2d 831, 835 (2d Cir.1992) (deportation "is a *civil* penalty") (emphasis in original). Hence, in comparing the punishments meted out to an alien and to a citizen, respectively, it is inapt to measure the latter's sentence against the former's sentence · plus deportation-related detention.

Second, "[i]n the case of an alien who is convicted of an offense which makes the alien subject to deportation," the Attorney General is directed to "begin any deportation proceeding as expeditiously as possible after the date of conviction." 8 U.S.C. § 1252(i) (1988). Any unnecessary delay in the initiation of deportation proceedings for the convicted alien is, at a minimum, contrary to the spirit of the law. Anticipatory "relief" from a possible delay, however, by way of a downward departure in sentencing is speculative and inappropriate. Remedy for such a delay may more appropriately be sought either by writ of habeas corpus, *see id.* § 1252(c) (1988), or by a lawsuit challenging the pertinent policies and practices of the Attorney General.

### 3. *Deportation*

■ The major factor relied on by the district court in departing was that Restrepo would be deported following his term of incarceration, thereby ending his resident alien status, separating him from his American

wife and children, and banishing him forever from the United States. Though these are indeed effects of his narcotics conviction as an alien, and though deportation, as a "forfeiture for misconduct of a residence in this country", is a civil "penalty," *Fong Haw Tan v. Phelan,* 333 U.S. 6, 10, 68 S.Ct. 374, 376, 92 L.Ed. 433 (1948), we cannot see that these effects justify shortening the sentence prescribed by the Guidelines.

While we have seen no indication that Congress, which provided for discretionary relief from deportation in limited circumstances, or the Sentencing Commission, which fashioned the Guidelines, considered the interplay between deportability and sentencing provisions, *accord United States v. Alvarez-Cardenas,* 902 F.2d 734, 737 (9th Cir.1990) (no guideline section "directly addresses" whether "threat of deportation is a legally permissible ground for departing"), it is difficult to believe that the Commission was not conscious that a large number of defendants sentenced in the federal courts are aliens. For example, in 1991, approximately 23 percent of the defendants sentenced under the Guidelines were aliens. United States Sentencing Commission, *1991 Annual Report* 50.

In any event, as a basis for downward departure, deportability is at best a factor at war with itself. On the one hand, there is no doubt that in some cases deportation may cause substantial hardship. On the other hand, the district court's reduction of the prison term in recognition of those hardships does not eliminate the hardships or make the effects less harsh; rather, it advances the day when deportation will occur. It is difficult to see that a condition not alleviated but rather hastened by the sentencing departure is a rational ground for the departure.

It is also noteworthy that despite the fact that hastening deportation would seem to exacerbate rather than remedy its harshness, a defendant who seeks such a departure apparently prefers that result to the longer sentence. If swifter deportation is the defendant's preference, it is perhaps erroneous to view deportation as so harsh as to warrant a reduction in the period of imprisonment prescribed by the Guidelines. Indeed, the district court's rationale, carried to its logical conclusion, would support a decision not to impose any term of imprisonment whatever.

In sum, to be appropriate, a departure from the Guidelines must not only be based on a factor not considered, in kind or to degree, by the Commission; it must also rationally be capable of remedying or alleviating the problem caused by that factor. The fact that Restrepo is to be deported is not alleviated by reducing his term of imprisonment.

CONCLUSION

We have considered all of Restrepo's arguments in support of the sentence and have found them to be without merit. The sentence is vacated, and the matter is remanded for resentencing consistent with the foregoing.