**UNITED STATES of America**

v.

**Peter BAKEAS.**

**No. CRIM. 96–10184–NG.**

United States District Court, D. Massachusetts.

Nov. 14, 1997.

Owen S. Walker, Federal Defender Office, Boston, MA, for Defendant.

Victor A. Wild, U.S. Attorney's Office, Boston, MA, for U.S.

## *MEMORANDUM AND ORDER*

GERTNER, District Judge.

Peter Bakeas (hereinafter "Bakeas") is a 33-year old Greek citizen who has lived in this country for twenty years and is a lawful permanent resident. He is a first offender. He has pled guilty to embezzlement by a bank officer. All parties agree that the appropriate sentence is 12 months. Were he an American citizen he would serve those 12 months in a prison camp—a minimum security institution. Solely because he is an "alien," he would serve that sentence under far more onerous conditions. The Bureau of Prisons takes the position that aliens are ineligible for minimum security classifications, no matter how many years they have lived in this country, no matter whether or not they are under an order of deportation.

Under the circumstances, I have concluded that this case is unusual, and outside of the heartland of cases under the guidelines. Indeed, I have determined that the purposes of the guidelines will not be served at all by the usual 12 months sentence. Based on the reasons outlined below, I have departed from the guideline sentence in order to create, to the extent possible, the functional equivalent of what the guidelines sentence would have been for a United States citizen. I departed to a level 10 and sentenced Bakeas to three years probation with a host of restrictive conditions,[1] ten months of which are to be

---

1. As conditions of probation, the defendant shall not commit another federal, state or local crime, shall comply with standard conditions that are described at USSG. § 5B1.4(a), and shall comply with the following special conditions:

served in home detention, confined to his small, spare apartment.

## I. INTRODUCTION

In 1977, Bakeas' parents established a home in West Lynn, Massachusetts, and their two sons, Bakeas and his brother, entered the public schools. Unlike his older brother who graduated from Boston University, the defendant accepted an entry-level position with the First National Bank of Greece after graduating from high school. In 1984, his parents returned to Greece.

A combination of youthful bad judgment, bad life choices, and a substantial cocaine habit led to this offense. The cocaine habit put the defendant in debt, a debt which he sought to repay through the embezzlements in this case.[2]

Bakeas is charged with Embezzlement by a Bank Officer, 18 U.S.C. § 656, to which he pled guilty. The funds were taken from family friends, and indeed, in one case, from a distant relative. When it was clear that he had been discovered, the defendant arranged to have the funds repaid.[3] His crime was uncovered during an audit of improprieties at the First National Bank of Greece. This audit eventually led to federal indictments unrelated to this case and guilty pleas by two bank officers, including the defendant's immediate supervisor. The Presentence Report (PSR) suggests that, to a degree, the defendant's offense was made possible, if not encouraged, by the lax ethical standards at the bank.

The guidelines calculations are: base offense level of four (under United States Sentencing Commission, *Guidelines Manual*, § 2B1.1); plus eight for the amount of loss (between $70,000 and 120,000); plus two for more than minimal planning; plus two for abuse of trust; minus three for acceptance of responsibility. The offense level is 13. The defendant has no criminal record. The guidelines suggest a sentence of 12 to 18 months for this offense.

The PSR, to which the Government does not object, recommends a sentence of 12 months. The defendant seeks a departure to less than that amount on account of "extraordinary rehabilitation" under *United States v. Sklar*, 920 F.2d 107 (1st Cir.1990), and on the ground that the atmosphere at the bank makes the defendant's embezzlement "more understandable." I decline to depart on either ground. Of far greater concern to me, as I describe below, is the extent to which Bakeas' alien status—and that fact alone—will totally transform the guidelines sentence.

## II. THE GUIDELINES SENTENCE

The Probation Department has recommended that Bakeas receive a sentence of 12 months, to be served in a community treat-

---

1. The defendant is prohibited from possessing a firearm or other dangerous weapon.
2. The defendant is prohibited from incurring new credit charges or opening additional lines of credit without the approval of the probation officer;
3. The defendant is to provide the probation officer access to any requested financial information.
4. The defendant is to submit to random urinalysis testing to determine if he has resumed drug use. He may be ordered to participate in a program designed to treat substance abuse.
5. If deported, the defendant is to leave the United States and is not to return without prior permission of the United States Attorney General. The reporting requirements of supervised release shall be suspended if the defendant is deported. If for any reason the defendant returns to the United States within the term of the Supervised Release, he is to report in person to the U.S. Probation Office in the District of his arrival and the conditions of supervised release shall become effective.

6. The defendant is prohibited from serving in any fiduciary capacity either privately or through employment in a financial institution without the approval of the U.S. Probation Office and only if formal notification is given to any third party of the defendant's conviction in the U.S. District Court.

2. Defendant represents that his use of cocaine came to a halt in 1986, although the debts from that period of time continues to haunt him.

3. After defendant confessed his embezzlement to his family, his uncle refinanced his Dorchester pizza business to raise money to make restitution. Although the Bank reports that almost $50,000 of this loan (including principal, interest, and late charges) remains unpaid, the Probation Department has concluded that this debt "while tangentially related to the defendant's conduct does not arise directly from his criminal activity .[and] may not be considered for restitution purposes."

ment center. Without any judicial recommendation of community confinement, Bakeas would normally be sentenced to a prison camp, a minimum security institution.

However, Probation indicated that the Bureau of Prisons has recently decided that non-citizens are ineligible to serve time in community confinement solely by reason of their non-citizen status. Because Bakeas is a lawful resident alien, the Bureau of Prisons would take the position that he is also ineligible for minimum security incarceration. He would instead be obliged to serve his time at FCI Oakdale, a Medium Security Level institution in Oakdale, Louisiana. The minimum security/camp unit in Oakdale, Louisiana, is reserved for U.S. citizens alone.[4]

Thus, while the guidelines contemplate a relatively light imprisonment, typically served in a minimum security setting or community confinement, Bakeas, because he is not a citizen, would do the same time in a substantially more punitive environment.

The defendant urges me to depart downward to reflect the substantially more severe conditions of confinement that he will face because of his non-citizen status. The Government takes two positions against departure, one general and one more specific. The Government takes the general position that I may not depart based on my analysis of the likely conditions of the defendant's confinement. That is the concern of the Bureau of Prisons, they suggest, not of this Court. The implications of this position are far reaching, and, as discussed below, in conflict with both the guidelines scheme and the case law interpreting it.

More specifically, the Government argues that I cannot take into account the fortuitous increase in the severity of Bakeas' sentence because any consideration of any effect of alienage is prohibited. This argument relies on a sweeping application of those cases in which consideration of *collateral consequences* of the defendant's alienage was held to be inappropriate, collateral consequences not involved in this case. It extends these holdings into a strong presumption against consideration of any consequences of alienage whatsoever.

A careful reading of the decisions of other courts that have considered the interaction of alienage and sentencing reveals that the effects of alienage should be considered no differently from any other factor that is neither prohibited nor discouraged nor encouraged: when those effects were not taken into account by the Commission in deriving the guidelines sentence, and when they are such as to make the case "unusual," departure may be appropriate.

It should also be noted that the key cases on which the Government relies predate the Supreme Court's decision in *Koon v. United*

---

4. The Bureau of Prisons policy raises grave concerns. Should a state have adopted the Bureau of Prisons' policy of assigning aliens to more restrictive conditions of confinement solely by reason of their alienage, it might not survive scrutiny under the Fourteenth Amendment. See *Nyquist v. Mauclet*, 432 U.S. 1, 7, 97 S.Ct. 2120, 2124, 53 L.Ed.2d 63 (1977); *Yick Wo v. Hopkins*, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886). The federal policy may also violate this nation's commitments under the International Covenant on Civil and Political Rights, Dec. 16, 1966, 999 U.N.T.S. 171 ("ICCPR") to which we became a party in 1992. Article 2 expressly prohibits discrimination on the basis of "status," including alienage—a prohibition that, ironically, the United States was instrumental in including in the Convention's initial drafts. The Human Rights Committee charged with enforcing the Convention has repeatedly made clear that the prohibition of discrimination is a guiding principle for the ICCPR as a whole and should inform the application of all of its provisions, including Article 9, governing detention. Human Rights Committee, *General Comment* 18, 37th Sess., U.N. GAOR, 45th Sess., Supp. No. 40, U.N. Doc. A/45/40 (1990). The only areas in which discrimination against aliens is permissible under the ICCPR are in the exercise of political rights, such as voting and running for office. Human Rights Committee, *The Position of Aliens Under the Covenant, General Comment 15*, 27th Sess., U.N. GAOR, 41st Sess., Supp. No. 40, U.N. Doc. A/41/40 (1986). Although the United States sought to "clarify" that it would be bound by its own understanding of discrimination, rather than that of the international community, the Human Rights Committee has the ultimate authority to decide whether parties' clarifications or reservations have any effect. Manfred Nowak, *The activities of the UN Human Rights Committee: Developments from 1 August 1992 to 31 July 1995*, 16 Hum. Rts. L.J. 377, 180 (1995). Given the centrality of non-discrimination to the ICCPR, it is unlikely that the Committee would allow the U.S. to carve out its own separate definition of its obligations under international law.

*States,* 518 U.S. 81, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996) and this Circuit's decision in *United States v. Rivera,* 994 F.2d 942 (1st Cir.1993).

I find that the transformation of the nature of Bakeas' sentence from a period of community confinement to the same period of incarceration in a medium security 24–hour lockup makes this case of first-offense embezzlement a significantly "unusual" one. In addition, because Bakeas' offense in no way intrinsically involved alienage, I see no reason to believe that the Commission took this possible consequence into account in setting the relevant guidelines sentence.

## III. *THE DEPARTURE FRAMEWORK*

This Court may depart downward if it finds that "an aggravating or mitigating circumstance exists that was not adequately taken into consideration by the Sentencing Commission in formulating the guidelines and that should result in a sentence different from that described." 18 U.S.C. § 3553(b). In such an "atypical" case, the Court may consider whether departure is warranted. USSG, Ch.1 Pt.A(b).

Early in the guidelines regime, downward departure was discouraged by the presumption that almost all possible factors must have already been taken into consideration by the Sentencing Commission, if only implicitly. *See, e.g., United States v. Restrepo,* 999 F.2d 640, 644 (2d Cir.1993) (deciding that alienage is by definition a characteristic that is not "ordinarily relevant," even though it was not listed as such by the Commission). However, the Supreme Court has recently reemphasized the Commission's own instructions: aside from a few prohibited factors it "does not intend to limit the kinds of factors, whether or not mentioned elsewhere in the guidelines, that could constitute grounds for departure in an unusual case." USSG Ch.1 Pt.A(b); *Koon,* 518 U.S. at ——, 116 S.Ct. at 2044. Indeed, the Commission expected and encouraged District Courts to depart in such cases, thereby providing the feedback essential to the further progress and refinement of the guidelines. USSG Ch.1 Pt.A(b); *Rivera,* 994 F.2d at 949–50.

## IV. *THE IMPACT OF BAKEAS' NON-CITIZEN STATUS ON THE SENTENCE IN ITS ENTIRETY*

The government argues that this Court must ignore any and all aspects of Bakeas' sentence that are in any way related to his non-citizen status, relying heavily on the Second Circuit's decision in *United States v. Restrepo,* 999 F.2d 640 (2d Cir.1993). In *Restrepo,* the district court had departed downward to reflect the "collateral consequences" that the defendant would suffer as a result of his status as a deportable alien, and imposed a sentence of 33 months, rather than the 41–51 months suggested by the guidelines. The three consequences that troubled the district court were: first, and most importantly, the fact that the defendant would inevitably suffer the severe punishment of "banishment," because his crime had made him deportable as a matter of immigration law; second, the defendant's ineligibility for a discretionary pre-release community confinement program during the final 10% of his sentence; and third, his likely future detention by the INS between his release from prison and his deportation. *Restrepo,* 999 F.2d at 642–43.

The Second Circuit overturned this downward departure, finding that to the extent that alienage is a characteristic shared by a large number of offenders, it should not normally take a case outside the "heartland." *Id.* at 644. Rather than resting its decision on a bright line rule that alienage is always irrelevant, however, the Second Circuit then addressed each of the specific consequences of alienage that had troubled the district court in Restrepo's case. Both deportation and pre-deportation detention by the INS, the court found, were civil consequences of Restrepo's status that would arise after his release from prison by the normal operation of immigration law. They could not be considered part of his criminal punishment and were thus clearly "collateral" to the sentence imposed by the court. *Id.* at 646–47. In addition, the Second Circuit questioned the logic of reducing the sentence out of concern for the personal hardship of banishment by deportation, given that any in sentence would

only hasten the date of forced departure. *Id.* at 647.

Most relevant here are the Second Circuit's reasons for rejecting a downward departure based on Restrepo's ineligibility to serve the final 10% of his sentence in community confinement. The government urges me to read this reasoning as foreclosing my consideration of Bakeas' future conditions of confinement. Admittedly, the court expressed the opinion that the district court should not take reasonable discretionary decisions of the Bureau of Prisons into account when imposing a sentence. *Id.* at 645. However, the government ignores what the Second Circuit found to be "more important" to its decision: community confinement occurred at the tail end of a long sentence, designed not as an intrinsic part of the punishment, but as an aid to the offender's imminent reentry into the community. It was perfectly appropriate, the court reasoned, to exclude from such a program a man who would be released not into the community but into INS custody for deportation. *Id.* at 645; *accord United States v. Simalavong,* 924 F.Supp. 610, 612 (D.Vt.1995).

In any case, any thought that *Restrepo* foreclosed consideration of alienage in all cases should be dispelled by the language of the *Restrepo* court itself. Although finding that the departure in this particular case was inappropriate, the Second Circuit left the door open for departures on the basis of non-citizen status under other circumstances. It pointed out that the guidelines' prohibition on consideration of national origin could not be read as a prohibition on consideration of alienage. On the contrary, the guidelines explicitly directed the consideration of alienage in sentencing for specific offenses.[5] *Restrepo,* 999 F.2d at 644. "We ... see nothing in the guidelines themselves," the court concluded, "that automatically excludes a downward departure on the ground of a defendant's alienage." *Id.*

Subsequent courts that have considered the effect of alienage on sentencing have agreed that a sentencing court should not consider immigration-related consequences that are marginal or collateral to the sentence itself, including the hardship of deportation or ineligibility for release to a halfway-house. *See, e.g., United States v. Nnanna,* 7 F.3d 420, 422 (5th Cir.1993) ("collateral consequences from conviction are not a basis for downward departure"); *United States v. Mendoza–Lopez,* 7 F.3d 1483, 1487 (10th Cir. 1993) (failure to depart based simply on the "unduly harsh consequences of imprisonment for deportable aliens" was not ground for remand); *United States v. Alvarez–Cardenas,* 902 F.2d 734, 737 (9th Cir.1990) (the "possibility of deportation" is not an appropriate grounds for departure); *Rivera v. United States,* 893 F.Supp. 1238, 1244 (S.D.N.Y.1995) (applying *Restrepo* to an argument identical to Restrepo's).[6]

By contrast, courts have found downward departure appropriate when a defendant's non-citizenship is more than collateral to his sentence but instead threatens to change the nature of the entire sentence. The D.C. Circuit has held that where a deportable alien's sentence would be more severe solely because of his alien status, a downward departure may be "proper." *United States v. Smith,* 27 F.3d 649, 655 (D.C.Cir.1994). The Smith court suggested three conditions that

---

5. The *Restrepo* court cited USSG. §§ 2L1.1(b)(3); 2L2.2(b)(1); 2L2.4(b)(1). All of these are offenses against immigration laws. *Restrepo,* 999 F.2d at 644. The latest edition of the *Guidelines Manual* provides for a 2 level increase in a case of immigration document fraud by an "unlawful alien who has been deported (voluntarily or involuntarily)." USSG § 2.L2.2(b)(1).

6. *United States v. Clase–Espinal,* on which the government relied heavily at the sentencing hearing, is distinct from this line of cases and inapplicable here for two reasons. First, it dealt with an offense of which alienage was an integral part, namely, unlawful reentry following a felony conviction and deportation. Obviously, the Sentencing Commission must have considered the possibility of deportability in crafting the guidelines sentence for such an offense. *United States v. Clase–Espinal,* 115 F.3d 1054, 1057 (1st Cir. 1997). Second, the claimed basis for departure in *Clase–Espinal* was neither the defendant's alienage and deportability, nor the effect of his status on his sentence. Rather, the government had agreed downward departure on the ground that the defendant's concession of deportability and waiver of his rights to a deportation hearing had provided an administrative benefit to the INS. *Id.* at 1059.

would make such a departure reasonable: the increase in severity is "substantial," it is undeserved, and it would affect "a substantial portion" of the sentence. *Id.* All three of those conditions are presented here.

The Seventh Circuit has likewise held that there is "no reason to believe" that the Sentencing Commission took a defendant's residency status into account in setting the base level for an offense that does not intrinsically involve unauthorized presence in this country. In such a case, the district court is "free to consider whether [the defendant's] status as a deportable alien has resulted in unusual or exceptional hardship in his conditions of confinement." *United States v. Farouil,* 124 F.3d 838 (7th Cir.1997); *United States v. Gonzalez–Portillo,* 121 F.3d 1122, 1125 (7th Cir.1997)("special status" of alienage may be an appropriate ground for departure if alien status is not "an inherent element of the crime").

In *United States v. Simalavong,* 924 F.Supp. 610, a sentencing judge in this circuit faced a dilemma very similar to the one here. The defendants' offense level, criminal history, and acceptance of responsibility placed them in a guidelines range that allowed the sentencing judge to sentence them to probation combined with intermittent confinement, community confinement, or home detention. Given the defendants' individual circumstances, the sentencing judge determined that incarceration was not appropriate. *Simalavong,* 924 F.Supp. at 611. However, the single fact of the defendants' Canadian citizenship prevented the sentencing judge from imposing the sentence authorized by the guidelines and befitting the circumstances of the case. *Id.* The court found that difference between an incarceratory and a non-incarceratory sentence was "precisely the kind of extraordinary effect" of alienage

that the *Restrepo* court had suggested should serve as the basis for a downward departure. *Id.* at 613. The court departed downward in order to impose a sentence of home detention—the sentence closest to that which it would have imposed on a United States citizen under the guidelines. *Id.* at 611. Bakeas is in precisely the same situation.

## V. UNUSUAL CONDITIONS OF CONFINEMENT

In imposing a sentence, I must consider not only the length of the sentence, but also the conditions under which it will be served. 18 U.S.C. § 3553 dictates that Bakeas' sentence must be "sufficient, but not greater than necessary." The government would suggest that in determining whether Bakeas' sentence will be greater than necessary, I cannot consider where that sentence will be served.

The law, however, instructs me otherwise. "[T]he kinds of sentence available" is explicitly listed as a factor to consider in imposing sentence under 18 U.S.C. § 3553(a). The *Guidelines Manual* sets out in detail the alternative types of confinement available under each Zone of the Sentencing Table, and how the different types may be substituted for each other. USSG § 5C1.1.

Prison camp and a medium security prison are as different in kind as are home detention and community confinement, and they have as great an impact on whether Bakeas' sentence is "greater than necessary." It would be inconsistent for the guidelines to instruct me to consider the latter difference and forbid me to consider the former.[7]

Whether a departure is justified in a particular case may be "determined in large part by comparison with the facts of other guide-

---

7. Whether a sentencing court can consider the conditions of confinement in imposing sentence, and shape the sentence accordingly, is a different issue from whether it can direct the Bureau of Prisons where to carry out the sentence. The former involves the proper exercise of judicial discretion, the latter would involve judicial encroachment on executive discretion. See 18 U.S.C. § 3621(b) (stating that the Bureau of Prisons should "consider" the sentencing court's recommendation of a "type of penal or correctional

facility"); *United States v. Jalili,* 925 F.2d 889, 894 (6th Cir.1991) (holding that although the district court may not designate a place of confinement, it may, within certain guidelines ranges, substitute supervised release for confinement, and set the conditions of that release); *United States v. Guiro,* 887 F.Supp. 66, 69 (E.D.N.Y.1995) (finding that the court had the power to direct where the defendant would serve her sentence of probation).

lines cases." Koon at 2047. This comparison may be drawn from this Court's "day-to'-day experience in criminal sentencing," *Koon* at —— – ——, 116 S.Ct. at 2046–47, but decisions of other courts faced with similar cases may also be instructive. Both sources lead this Court to conclude that the guidelines did not take into account the possibility that a defendant's alienage might significantly transform the severity of the entire length of his sentence, especially if the sentence is for an offense that is in no way intrinsically related to immigration. Both the inappropriate severity of the sentence, and the fact that it is due solely to Bakeas' non-citizenship, make a downward departure proper in this case.

In Koon, the Supreme Court upheld a district court's downward departure based in part on the unusually harsh conditions the defendants were likely to experience in prison. *Koon*, 518 U.S. at ——, 116 S.Ct. at 2035 (upholding a downward departure because the defendants were particularly likely to be targets of abuse in prison). A number of lower courts have departed downward in order to ensure that an offender would serve his or her sentence under appropriate conditions of confinement, in an appropriate institution or program. *See, e.g., United States v. Williams,* 65 F.3d 301, 307 (2d Cir.1995) (upholding a downward departure so that the defendant would be eligible for a prison drug-treatment program); *United States v. Hollenbeck,* 932 F.Supp. 53 (N.D.N.Y.1996).

In a situation similar to this one, another district court found that although a sentence to a halfway house was the most appropriate sentence under the guidelines, it could not be imposed for reasons that had nothing to do with the offense.[8] The court therefore departed downward to impose a sentence of probation and eight months home detention, to approximate as closely as possible the sentence it would have imposed under the

guidelines. *United States v. Guiro,* 887 F.Supp. 66, 71 (E.D.N.Y.1995). Thus, downward departure is called for when, as here, an unusual factor makes the conditions of confinement contemplated by the guidelines either impossible to impose or inappropriate.

The government states that Guiro is not First Circuit law. It relies on *United States v. Pozzy,* 902 F.2d 133, 139–140 (1st Cir. 1990), in which the First Circuit commented that "the absence of a halfway house should not constitute the kind of unusual circumstance that should warrant departure." This Circuit, however has expressly undermined *Pozzy,* identifying it as a case early in the guidelines regime that might now be decided differently in light of their subsequent recognition of the continuing importance of the district judge's discretion. *Rivera,* 994 F.2d at 950.

Indeed, in *Pozzy,* the sentencing judge had prefaced his sentencing decision with an announcement, in effect, of his intention not to apply the guidelines at all.[9] He then departed downward on a number of grounds that he acknowledged were probably prohibited from consideration under the guidelines, including the defendant's pregnancy, the fact that her husband would also be incarcerated, and an unsubstantiated belief that in a crime committed jointly by a husband and wife, the husband must in some way be responsible for the wife's crime. *Id.* at 135–136. In addition, he departed downwards on the grounds that there was no halfway house available in the defendant's state in which she could serve her sentence. *Id.* at 137.

The First Circuit rejected both the judge's consideration of specific prohibited grounds for departure, and his more general attempt to "nullify" the guidelines by substituting his own "totality of the circumstances" approach to sentencing. *Id.* at 138. In explaining

---

**8.** There were no halfway houses in the defendant's state.

**9.** The First Circuit quoted the judge as stating:
I made a decision long ago that if I was going to err in sentencing defendants, that I was going to err on the side of leniency. It may be that such an error or such errors will cause my actions to be questioned by higher courts.... I think that

the circumstances in this case warrant a departure downward. I don't think that there's any way that I can look at a specific provision of the guidelines and apply it to this situation. If that were the case, in all probability there would not be any departure downward. I think that we must look at the totality of the circumstances ...
(*Pozzy,* 902 F.2d at 136.)

their disapproval, the First Circuit announced an opposite rule of strong adherence to the letter of the guidelines. Giving the guidelines "a fair test," this Circuit reasoned, required following "both [their] spirit and [their] written directions...." *Pozzy*, 902 F.2d at 140. "Sentencing is no longer the exclusive domain of the district judge." *Id.* Accordingly, the Circuit held that anything not clearly considered by the Commission could not be considered by the sentencing court. *Id.* at 139–140.

It is this approach that the First Circuit has now explicitly rejected. Under the new rule of *Rivera*, a district judge must not presume that anything not mentioned by the Commission is outside the possible grounds for departure. Rather, relying on her expertise and "special competence" in sentencing, she may exercise her discretion in deciding whether a case is "unusual." Because the Commission has expressly said that it did not take unusual cases into consideration, "once the court ... has properly determined that a case is, indeed "unusual," the case becomes a candidate for departure...." *Rivera*, 994 F.2d at 947.

Even if the First Circuit had not itself questioned both the reasoning and the result in *Pozzy*, finally, the interaction between the defendant's offense, status, and sentence are fundamentally different in this case, and would lead to a different result. Susan Pozzy's offense would have made her ineligible for sentencing to a halfway house under the guidelines had the judge not additionally departed downward based on her marriage and pregnancy. *Pozzy*, 902 F.2d at 140. Moreover, the departure was largely inspired by further consideration of the pregnancy itself. *Id.* at 137 (quoting the sentencing judge as remarking that confinement to a halfway house out-of-state "would require her to nurture her pregnancy and have this baby outside her home, away from her family ... ") Thus, the downward departure based on the unavailability of a halfway house was inextricably bound up with the judge's determination to consider the defendant's physical condition and marital status, in spite of guidelines rules to the contrary.

In this case, by contrast, Bakeas' offense would have led to at most a minimum security incarceration, solely *but for* his status as a lawful permanent resident. Here, a downward departure is intended to accomplish a very limited purpose: it seeks to counteract the way in which the defendant's status would otherwise prevent the imposition of an appropriate guidelines sentence.

## VI. *CONCLUSION*

If the defendant had been a United States citizen, I would have been able to impose a sentence of 12 months' confinement, with the recommendation that it be served in community confinement. This is the sentence proposed by the Probation Department and not opposed by the government. It requires no departure from the guidelines range.

However, the mere fact that Bakeas remains a lawful permanent resident after 20 years in this country makes this sentence impossible. Because of the current Bureau of Prisons policy, a sentence within the guidelines range would have meant a sentence to a medium security prison. Such a sentence would be quite "unusual" for this offense and this offender. Given that the defendant's non-citizen status played no role in the offense itself, I fail to see that such an unusual result was contemplated by the Commission.

The defendant will serve the three years of supervised release suggested by the Probation Department and which he would have served if he were a United States citizen. He will serve ten months of that time in home detention, confined to a small apartment immediately off Route 128, entirely bare of furniture except for a small television and two chairs. He will only be allowed to leave this apartment for work, religious observance, or medical care. He will bear the costs of the electronic monitoring necessary to enforce this sentence. Although this is perhaps an even bleaker sentence than he would have received as a United States citizen, it is as close as the current Bureau of Prisons policy allows me to come in imple-

menting the sentence the guidelines envisioned for this crime and this offender.

**SO ORDERED.**