UNITED STATES of America, Appellee,

v.

N. Slade SHARPSTEEN,
Defendant–Appellant.

No. 97, Docket 89–1418.

United States Court of Appeals,
Second Circuit.

Argued Aug. 31, 1990.

Decided Sept. 18, 1990.

**60**

John Humann, Buffalo, N.Y., for defendant-appellant.

Joseph M. Guerra, III, Buffalo, N.Y., Asst. U.S. Atty., (Dennis C. Vacco, U.S. Atty., of Counsel), W.D.N.Y., for appellee.

Before FEINBERG and
CARDAMONE, Circuit Judges, and RE,
Chief Judge.*

FEINBERG, Circuit Judge:

N. Slade Sharpsteen appeals from a judgment of conviction in the United States District Court for the Western District of New York, after a jury trial before Judge John T. Elfvin, of conspiracy to counterfeit United States currency. The judge imposed a sentence of 30 months imprisonment, two years supervised release and a $50 special assessment. Appellant claims that his conviction should be set aside and a new trial granted because the mention of a failed polygraph test by the government's main witness was highly prejudicial and because the court erred in a supplemental jury charge. Appellant also argues that his sentence was improperly imposed because, among other things, the judge mistakenly assumed that he did not have authority to make a downward departure

from the Sentencing Guidelines. For reasons given below, we affirm appellant's conviction, but remand to the district court for reconsideration of the sentence.

### Background

In the spring of 1988, government agents received information that two persons, later identified as Timothy Divita and Jesse Best, were interested in selling a large amount of counterfeit money. A meeting was then arranged on May 10, 1988 at a Howard Johnson's restaurant in Niagara Falls, New York, between Divita and Best and an undercover agent, who posed as a potential buyer of the counterfeit money. In the course of the meeting, the agent agreed to buy a million dollars worth of counterfeit money from Divita and Best for $150,000. Pursuant to this agreement, a meeting was set up a few days later at a Ramada Inn in Niagara Falls to which Divita and Best brought counterfeit money totaling roughly $987,000. Upon appearing at the Ramada Inn with the money, Divita and Best were arrested by federal agents. Following their arrest, they each gave a signed statement that did not mention the participation of defendant Sharpsteen, who was an experienced printer, in their counterfeiting scheme.

In early July, after pleading guilty to conspiracy to violate the counterfeiting laws, Divita informed agents of Sharpsteen's participation in the scheme and agreed to serve as a government informant soliciting incriminating statements from Sharpsteen. A few days later, Divita placed a telephone call to Sharpsteen under the direction of government agents. In the call, which was recorded, Divita stated at the outset:

> Yeah, and I went for a polygraph test and they don't believe me and I'm downtown right now and I have to go for another one.

The agent supervising the recording of the conversation had suggested that Divita bring up the polygraph test as the purport-

---

* Honorable Edward D. Re, Chief Judge, United States Court of International Trade, sitting by designation.

ed reason for the call. Later in the conversation, Sharpsteen replied to Divita:

> Just stick to your guns man. Polygraph tests don't mean nothing. You know what I mean? Them things, that's your reason right there, you're scared. I would just stick to it.

Sharpsteen was indicted in September 1988 on three counts, charging him with (1) counterfeiting twenty-dollar bills, in violation of 18 U.S.C. §§ 471 and 2, (2) aiding and abetting the passing of such counterfeit bills, in violation of 18 U.S.C. §§ 472 and 2, and (3) conspiring to commit the crimes charged in counts one and two, in violation of 18 U.S.C. § 371. Trial commenced in late May 1989 and ended in early June. The government rested its case at trial principally upon the testimony of Divita, who testified that defendant fully participated in carrying out the conspiracy. Divita himself conceded that he was the actual ringleader of the counterfeiting operation. Sharpsteen testified in his own defense, admitting that he had been a regular acquaintance of Divita but insisting that he never agreed to collaborate in the counterfeiting scheme. Sharpsteen called several character witnesses on his behalf, including the pastor of a local church and the president of the town's Chamber of Commerce, both of whom testified as to defendant's widespread reputation for honesty and integrity in the community. The jury returned a verdict of not guilty on the first two counts, but found defendant guilty of conspiracy to counterfeit currency. In its deliberations, the jury requested clarification of the charge on the conspiracy count, and the court gave the jury a supplemental instruction discussed in more detail below.

In August 1989, Judge Elfvin imposed sentence on the conspiracy count. He followed the Probation Department's calculation of a total offense level of 19 in accordance with the Sentencing Guidelines, adding two levels in defendant's offense level for "special skills" pursuant to Guideline section 3B1.3. The judge also denied Sharpsteen's requests for downward adjustments in his sentence on grounds of duress, minor participation in the offense, and family ties and responsibilities. The judge then sentenced Sharpsteen to a term of 30 months of incarceration and two years of supervised release, which was the lowest sentence within the Guidelines range for his calculated offense level. This appeal followed.

## Discussion

### A. *Alleged trial errors*

Appellant argues that his conviction was seriously flawed in two respects. First, he claims that the district court should not have admitted a taped conversation between Divita and himself that contained mention of Divita's failed polygraph test because the reference was highly prejudicial. Finding that the reference placed the conversation in context, the court denied Sharpsteen's motion to have the tape redacted to eliminate any reference to the test. Appellant's argument assumes that the jury could readily have inferred on the basis of mention of the failed polygraph test that Divita initially lied to the police in not identifying Sharpsteen as a participant in the conspiracy scheme. Given the undue weight that jurors would be inclined to accord "scientific" polygraph testimony, appellant argues, the slight probative value of this testimony in setting the context of the taped conversation is greatly outweighed by its prejudicial effect.

Appellant's argument obscures the extent to which it was clear at trial that Divita referred to the failed polygraph test only because the agent monitoring the conversation told him to do so. It was apparent, in other words, that mention of the test in the telephone call was a ruse devised to provide Divita with a reason to contact the defendant and to elicit potentially incriminating statements. The government did not imply or argue before the jury that Divita had actually taken, or had agreed to take, a polygraph test. In fact, Divita was given a polygraph test which he passed. No mention of this test was ever made at trial, in the recorded telephone call or otherwise.

Moreover, even if reference to the test was error, the court's instructions to the jury, which were not objected to, were sufficient to ensure that the error was harmless. The court advised the jury that

> The results of any polygraph test ... are not admissible ... to show the existence or non-existence of facts and issues. They have no place in the courtroom. Whether or not Mr. Divita underwent a polygraph examination ... is completely immaterial in your deliberations.

Such a charge in this context suffices to cure the possibility of prejudice. *United States v. Kiszewski*, 877 F.2d 210, 216–17 (2d Cir.1989); *United States v. Betancourt*, 838 F.2d 168, 175–76 (6th Cir.), cert. denied, 486 U.S. 1013, 108 S.Ct. 1748, 100 L.Ed.2d 210 (1988).

 Second, appellant challenges the propriety of the judge's supplemental jury charge regarding the conspiracy count. The judge gave this charge following a written query from the jury as to whether in reaching a verdict on the conspiracy count it should separate its decision into two parts covering the two different crimes charged as objects of the conspiracy, that is, making and distributing counterfeit money. In its supplemental charge, the court instructed the jury that in order to find the defendant guilty on the conspiracy charge it need only determine that he conspired to commit at least one object of the conspiracy (rather than both), as long as the jury unanimously agreed on the object the defendant conspired to bring about. Appellant objects to this charge on the ground that the court should have instructed the jury that it was necessary to find unanimously that the defendant agreed both to making and distributing the counterfeit currency. He claims that the court's failure to so charge invited a less than unanimous verdict.

The government argues that the supplemental charge merely repeated what the judge had told the jury in his original charge, to which Sharpsteen had not objected, and that the charge in any event was not erroneous. Putting aside the question of waiver, we agree with the government.

The law is clear that a guilty verdict may be returned on a conspiracy count setting forth more than one object as long as the jury unanimously agrees that the defendant conspired to commit at least one object of the conspiracy. *United States v. Murray*, 618 F.2d 892, 898 (2d Cir.1980). The court's supplemental charge closely followed prevailing law on this matter. Furthermore, the charge did not invite a less than unanimous verdict, because the judge explicitly told the jury that it had to agree unanimously on the object of the conspiracy.

## B. *Sentencing claims*

Appellant also raises a number of claims regarding his sentence. He suggests that the district court mistakenly thought it could not consider a downward departure from the Sentencing Guidelines. Appellant argues that he should have received such a sentence because of his personal background, and because he committed the crime under duress. He also maintains that the district court erred in applying the "special skills" upward adjustment found in Guideline section 3B1.3, thereby mistakenly increasing his total offense level by two points from 17 to 19.

 The last contention does not require much discussion. Given the substantial testimony concerning the operation of the printing press that produced the counterfeit money, the district court did not abuse its discretion in finding that defendant's expertise as a printer constituted a special skill that significantly facilitated the commission of the offense.

 Appellant's objection to the district court's refusal to consider a downward departure under the Guidelines, however, raises more serious issues. It is settled law in this circuit that a defendant generally may not appeal from a district court's decision not to depart downwardly from the applicable Guidelines range because the decision is "inherently discretionary" and because "Congress did not intend to provide appellate review of sentences that are within the Guidelines correctly applied and are not illegal." *United States v. Colon*, 884

F.2d 1550, 1554 (2d Cir.), cert. denied, —— U.S. ——, 110 S.Ct. 553, 107 L.Ed.2d 550 (1989); *United States v. Soliman,* 889 F.2d 441, 443 (2d Cir.1989). In *Colon,* we construed the provisions of 18 U.S.C. § 3742(a) narrowly—in a manner consistent with the statutory language and congressional intent—and held that a defendant generally does not have the right to appeal a sentence that falls within the Guidelines range in contrast to one that upwardly departs from it. 884 F.2d at 1555–56. If we apply the *Colon* principle to the present case, it may appear that the district court properly acted within the bounds of its discretion in refusing appellant's request for a downward departure and hence that its decision is not appealable.

■ However, appellant does not challenge the district court's decision on the ground that in refusing a downward departure it unreasonably exercised its discretion. Rather, his claim is that the decision was the result of an error of law, namely, the court's mistaken conception that it lacked the authority under the Guidelines to make a downward departure in light of the considerations adduced by appellant. Based on this argument, appellant's appeal of the district court's decision is not precluded by our ruling in *Colon.* Indeed, in *Colon* we singled out a case in which a sentencing judge "may have been unaware of power to depart from Guidelines" as an instance in which the defendant's right of appellate review is preserved. *Id.* at 1553, citing *United States v. Russell,* 870 F.2d 18 (1st Cir.1989). Thus, if the refusal to depart downward is based on a district court's mistaken view that it lacks the authority to depart, a defendant retains his right to appeal this denial. *United States v. Adeniyi,* 912 F.2d 615, 619 (2d Cir.1990); see also *United States v. Bayerle,* 898 F.2d 28, 31 (4th Cir.1990), petition for cert. filed, 58 U.S.L.W. 3819 (U.S. June 26, 1990); *United States v. Howard,* 902 F.2d 894, 895–96 (11th Cir.1990).

■ The question before us, then, is whether the district court's refusal of a downward departure was based on a mistaken conception of its authority under the Guidelines. That the court had the authority to depart on the basis of considerations offered by appellant cannot be denied. Appellant identified at least two factors at his sentencing hearing that would warrant a downward departure: duress resulting in commission of the offense, covered by section 5K2.12 of the Guidelines, and family ties and responsibilities, covered by section 5H1.6. While appellant presented virtually no evidence to make a credible claim of duress, his appeal to extensive family ties and responsibilities was not a matter of dispute. Section 5H1.6 specifies that these considerations "are not *ordinarily* relevant in determining whether a sentence should be outside the guidelines" (emphasis supplied). This contrasts with section 5H1.10, which deals with race, sex, national origin, creed, religion and socio-economic status. Instead of specifying that certain factors are not "ordinarily relevant," section 5H1.-10 excludes without qualification the aforementioned characteristics as relevant to determination of a sentence. The clear implication of section 5H1.6 is that if the court finds that the circumstances related to family ties and relationships are extraordinary, it is not precluded as a matter of law from taking them into account in making a downward departure. Cf. *United States v. Lara,* 905 F.2d 599, 603 (2d Cir.1990); *United States v. Big Crow,* 898 F.2d 1326, 1331 (8th Cir.1990); *United States v. Burch,* 873 F.2d 765, 768 (5th Cir.1989).

It is unclear from the record of appellant's sentencing hearing whether Judge Elfvin recognized that he had authority under the Guidelines to depart downwardly in view of defendant's family ties and responsibilities. His comments at one point suggest that while he understood he could so depart under section 5H1.6 in considering family ties, he concluded that appellant's circumstances in this respect were not sufficiently extraordinary to warrant such a departure. Subsequent passages in the transcript, however, are ambiguous on this issue. At a later point, for example, the judge appeared to suggest that in the absence of the Guidelines he would have given serious consideration to a sentence of probation:

In the old days, prior to the change of the law relative to sentencing and the generation of these sentencing guidelines.... I would frankly have given a lot more attention and some real consideration, one to these [character reference] letters, two, to what I know is a very tough situation as far as Mr. Sharpsteen is concerned, his business is concerned, his family is concerned, when as he knows and I know, he must be sentenced to some incarceration. There would be merit perhaps in giving him a period of probation with maybe some additional duties, certainly a staunch fine on top of it, but now, of course, I am not permitted to even consider probation when we're at this level.[1]

He later increased this ambiguity in responding to defendant's plea for leniency by insisting that "my hands are tied by the new guidelines."

In light of this ambiguity in the record, we believe that the best course is to remand this case to the district court for reconsideration of the sentence. In so doing we do not mean to suggest in any way that the district court erred in its denial of defendant's request for a downward departure. The only issue on remand is whether the district court recognized, in imposing a sentence of 30 months imprisonment, that it had the discretion to make a downward departure under the Guidelines. If upon reconsideration the district court decides that the answer to this question is affirmative, then the sentence should stand as originally imposed. On the other hand, if the district court did not realize that it had such discretion, then appellant should be resentenced in accordance with the court's proper recognition of the extent of its authority.

Appellant's conviction is affirmed, and the case is remanded to the district court for reconsideration of the sentence in accordance with this opinion. Since appellant is presently serving his sentence, the mandate shall issue forthwith.

---

1. It should be noted that we have recently held that because extraordinary circumstances warranted a downward departure, it was within the district court's discretion to reduce a sentence to an extended term of probation. See *United States v. Jagmohan*, 909 F.2d 61, 65 (2d Cir. 1990), which holds that the district court's downward departure from a sentence of 15–21 months to a term of three years probation did not constitute an abuse of discretion in view of defendant's stable employment history and his unusual conduct in commission of bribery offense.