**UNITED STATES of America, Appellee,**

v.

**Alberto MONTEZ–GAVIRIA,**
**Defendant–Appellant.**

**Docket 97–1682.**

United States Court of Appeals,
Second Circuit.

Argued Oct. 1, 1998.

Decided Dec. 14, 1998.

Jonathan Etra, Assistant United States Attorney (Robert E. Rice, Assistant United States Attorney, of counsel, and Mary Jo White, United States Attorney, on the brief), for Appellee.

Philip L. Weinstein, Legal Aid Society, New York, New York, for Defendant–Appellant.

Before: CARDAMONE, CALABRESI, and STRAUB, Circuit Judges.

CALABRESI, Circuit Judge:

Defendant-appellant Alberto Montez–Gaviria was convicted in the United States District Court for the Southern District of New York (Jed S. Rakoff, *Judge*) of illegally entering the country after having been deported. Before his federal conviction and after being sentenced to conditional discharge on an unrelated state crime, he was confined for eight months in a state jail—on an INS detainer—while awaiting transfer to federal custody. At his sentencing hearing, Montez–Gaviria argued that this uncredited period of incarceration (along with his agreement not to contest his deportation after serving his sentence) supported his motion for a two-level downward departure from the Sentencing Guidelines. The district court mistaken-

ly thought that it could apply the eight months served on the detainer toward Montez–Gaviria's federal sentence by deeming that sentence to have begun when the INS first placed its detainer on Montez–Gaviria. The court also granted a one-level downward departure on the basis of Montez–Gaviria's stipulated deportation. It is unclear from the record whether the district court would have ordered a larger downward departure had it known that it could not, in fact, affect the date on which the defendant's sentence was deemed to have commenced. Accordingly, we vacate the sentence and remand the case to the district court so that it may consider whether it should depart further on the basis of Montez–Gaviria's uncredited time served in state custody.

## I. BACKGROUND

### A. Facts and Procedural History

Montez–Gaviria, a citizen of Colombia, entered the United States illegally in 1981. In 1982, he was convicted in New York state court of first-degree manslaughter. Eight years later, following Montez–Gaviria's release from state prison, the Immigration and Naturalization Service ("INS") deported him.

Montez–Gaviria illegally returned to the United States in 1994. On November 18, 1996, he was convicted in New York state court of disorderly conduct. Montez–Gaviria was sentenced to conditional discharge but was not released because the INS lodged a detainer against him on the day he was convicted. Three days later, INS officials interviewed Montez–Gaviria in state prison. During the interview, he admitted to entering the United States illegally. On March 14, 1997, Montez–Gaviria was indicted on one count of illegally entering the United States after having been deported in violation of 8 U.S.C. § 1326(a) & (b)(2). An arrest warrant was issued on March 20. The INS did not take Montez–Gaviria into federal custody, however, until July 1997. In August 1997, Montez–Gaviria pled guilty to the federal charge.

### B. Sentencing

The Presentence Report ("PSR") calculated Montez–Gaviria's total offense level as 21. Montez–Gaviria's prior manslaughter convic-

tion gave him a criminal history category of III, resulting in a sentencing range of 46 to 57 months' imprisonment. The PSR recommended a sentence at the low end of whatever the sentencing court determined to be the applicable sentencing range.

After the preparation of the PSR but before his sentencing hearing, Montez–Gaviria moved for a two-level downward departure on the ground that he had consented to deportation following his release from prison. A one-level departure would have reduced Montez–Gaviria's sentence range to 41 to 51 months, while a two-level departure would have yielded a range of 37 to 46 months.

Montez–Gaviria's sentencing hearing took place in November 1997. The primary issue at the hearing was whether Montez–Gaviria's consent to deportation should result in a one-level or two-level departure. In arguing for a two-level departure, Montez–Gaviria's counsel pointed out that his client had been incarcerated for eight months in state jail while awaiting transfer to federal custody. The lawyer noted that he did not propose this incarceration time "as an independent ground for departure," but rather, as "an additional reason" for the court to depart downward by more than one level.

The government argued for a one-level departure on the ground that a two-level departure would increase a sentencing disparity between defendants who are citizens and those who are aliens. When the court noted that Montez–Gaviria's incarceration in state custody "was real jail time ... that no credit is being given for," the government suggested that instead of using the uncredited state custody as a basis for a two-level departure, the district court could, as it had done in a previous case, deem federal custody to have begun during Montez–Gaviria's state custody. The district judge seemed amenable to this suggestion and stated:

> Where there are multi-point departure possibilities[, i]t seems to me eminently sensible to reserve the most extreme departure for the most extreme and deserving cases. And ... I am not convinced that this is such a case. What I do think is that there is a lot of force to the point about the artificiality of his not getting

credit for time that he served in state incarceration....

After receiving further comments from the government, Montez–Gaviria's lawyer, and Montez–Gaviria himself, the district court found that a one-level departure was appropriate and sentenced Montez–Gaviria to 41 months, the minimum sentence in the resulting range. It then deemed that this sentence "commenced on the date that the defendant would have been released from state custody on his 1996 disorderly conduct charge but for the lodging of the federal detainer." The effect of this sentence would have been a 33–month period of additional jail time—a shorter sentence than would have ensued had the court departed downward by two levels.

### C. Montez–Gaviria's Mistaken Deportation

We heard oral argument in this case on October 1, 1998. In the days immediately following, events took a surprising turn. Attempting to contact Montez–Gaviria to discuss the status of his appeal, his counsel discovered that the INS had mistakenly deported Montez–Gaviria on October 5. Apparently, the terms of the writ by which Montez–Gaviria was transferred to federal custody in 1997 provided that he was to be returned to state custody following his federal prosecution. Pursuant to these terms, federal marshals transferred Montez–Gaviria from federal prison to state custody in February 1998. At the same time, they filed a detainer so that he would be returned to federal prison when state proceedings against him had concluded. In August 1998, however, state authorities released Montez–Gaviria to the INS, who deported him. Both the state and the INS had the detainer in their files but somehow failed to act upon it. In view of Montez–Gaviria's agreement to deportation, one can only surmise that he reacted much like Brer Rabbit did when tossed into the briar patch.

Upon learning of his client's deportation, Montez–Gaviria's lawyer moved this court to dismiss his appeal without prejudice. This would allow Montez–Gaviria to reinstate his appeal if he ever returns to the United States. We address this request, in addition to the merits of the appeal, in this opinion.

## II. DISCUSSION

### A. Motion to Dismiss the Appeal

In support of his motion to dismiss his client's appeal, Montez–Gaviria's lawyer asserts (1) that the issue raised on the merits of the appeal will only become relevant if Montez–Gaviria returns to the United States;[1] (2) that he needs to, but cannot, consult with his client about whether to proceed with the appeal in light of the potential for an increased sentence upon remand; and (3) that if we decide to remand for plenary resentencing, Federal Rule of Criminal Procedure 43(a) would require his client's presence at the resentencing hearing.

While it may well turn out that Montez–Gaviria never returns to this country and so never actually has to serve out the sentence that he challenges on appeal, we think it best to exercise our discretion to proceed on the merits. If we dismiss Montez–Gaviria's appeal and he returns and reinstates his appeal (perhaps many years from now), the court, as well as counsel for both parties, will have to replicate much of the effort that has already been invested in this appeal. A decision on the merits therefore conserves judicial resources, in addition to the resources of the government and of the Legal Aid Society. Moreover, we can decide the merits without harm to Montez–Gaviria. As explained later in this opinion, we can tailor our mandate in a way that avoids either resentencing Montez–Gaviria in his absence or any prejudice that Montez–Gaviria's current unavailability might cause him. We therefore deny the motion to dismiss the appeal.

### B. The District Court's Error

Both parties agree that the district court exceeded its authority when it deemed Montez–Gaviria's sentence to have begun at the time that the INS lodged its detainer. The Bureau of Prisons, and not the courts, determines when a defendant's sentence

---

1. As both parties agree, it is clear that Montez–Gaviria's deportation does not moot the appeal. *See United States v. Villamonte–Marquez,* 462 U.S. 579, 581 n. 2, 103 S.Ct. 2573, 77 L.Ed.2d 22 (1983); *United States v. Londono,* 100 F.3d 236, 241–42 (2d Cir.1996).

starts and whether the defendant should receive credit for any prior time spent in custody. *See United States v. Labeille–Soto,* 163 F.3d 93, 98 (2d Cir.1998); *Werber v. United States,* 149 F.3d 172, 179 (2d Cir.1998); *United States v. Pineyro,* 112 F.3d 43, 45 (2d Cir.1997) (per curiam); *see also* 18 U.S.C. § 3585 (delineating when a sentence commences and when a defendant should receive sentence credit). Accordingly, the district court erred as a matter of law when it attempted to credit Montez–Gaviria's sentence for time served in state custody. *See Labeille–Soto,* 163 F.3d at 99–100. It is therefore clear that we must at least remand to the district court so that it can strike the portion of its judgment that purports to determine when Montez–Gaviria's sentence began.

### C. Appealability of the Sentence

■ The issue that constitutes the crux of this appeal, however, is whether, in light of the invalidity of the direct sentence credit, we should go further and vacate Montez–Gaviria's sentence entirely, thereby allowing the district court to revisit its decision to depart downward by only one level. The government asserts that our appellate review cannot reach the district court's departure decision.

■ It is true that a sentencing court's refusal to grant a downward departure is not normally reviewable on appeal. *See United States v. Matthews,* 106 F.3d 1092, 1095 (2d Cir.1997); *United States v. Moore,* 54 F.3d 92, 102 (2d Cir.1995); *United States v. Harris,* 38 F.3d 95, 97 (2d Cir.1994); *United States v. Piervinanzi,* 23 F.3d 670, 685 (2d Cir.1994). This rule, which finds its roots in 18 U.S.C. § 3742(a)(1),[2] reflects Congress' desire that appellate courts not infringe on the traditional sentencing discretion of district courts. *See United States v. Colon,* 884 F.2d 1550, 1554 (2d Cir.1989).

Appeals in which a defendant claims that a sentencing decision arose out of a district

court's misconstruction of law, however, have no such effect on the sentencing court's discretion. Thus, in *United States v. Sharpsteen,* 913 F.2d 59 (2d Cir.1990), we contrasted the unappealability of decisions not to depart downward when the claim is that the district court unreasonably exercised its discretion with the appealability of refusals to depart downward when the appellant asserts an error of law. *Id.* at 63. Similarly, our recent decision in *United States v. Labeille–Soto* expressly held that errors of the type that the district court made in this case render the court's decision not to depart downward reviewable on appeal:

> When the sentencing court has indicated its desire to impose a sentence outside the Guidelines range, we see no material difference between a mistaken view that it had no power to depart and a mistaken view that it could impose such a sentence in a way that the law does not permit. We conclude that a court's failure to depart, based on either type of mistake, is reviewable.

163 F.3d at 100. Thus, to the extent, if any, that the district court's mistaken belief that it could directly credit Montez–Gaviria's sentence for his uncredited time served in state custody influenced its departure decision, Montez–Gaviria is entitled to a reexamination of the district court's departure decision.

### D. Authority to Depart Downward on the Basis of Uncredited Incarceration

■ Before addressing the issue of whether the district court's belief that it could not credit Montez–Gaviria's sentence directly affected its choice not to depart downward by an additional level, we must determine whether Montez–Gaviria's uncredited incarceration itself constitutes a valid reason for departing from the Guidelines. We conclude that nothing in the Sentencing Guidelines precludes the district court from departing downward under § 5K2.0 on the basis of Montez–Gaviria's uncredited time served in state custody.[3]

---

**2.** Section 3742(a)(1) provides that "[a] defendant may file a notice of appeal in the district court for review of an otherwise final sentence if the sentence ... was imposed in violation of law." 18 U.S.C. § 3742(a)(1).

**3.** As an initial matter, we note that the government failed to argue that the district court was not entitled to use Montez–Gaviria's uncredited time served as a ground for a downward departure. In fact, its brief seems to concede that uncredited time served can—in appropriate circumstances—be a proper basis for such a down-

We have held under circumstances that are quite similar to those of this case that a district court has discretion to grant a downward departure. In *United States v. Ogbondah*, 16 F.3d 498 (2d Cir.1994), the defendant was arrested and arraigned on federal charges for importing heroin. *Id.* at 499. She was then released on bail. *See id.* Immediately upon her release, however, the INS, having lodged a detainer against her, took her into custody. *See id.* Although the defendant promptly requested revocation of her bail, bail was not revoked for two more weeks. *See id.* As a result, the defendant was incarcerated for two weeks that did not yield sentence credit. *See id.* The district court, expressing a concern that departing downward on account of the defendant's uncredited incarceration was outside its authority, declined to grant the defendant a departure. *See id.* We vacated the defendant's sentence, holding that such a departure was in fact within the court's authority, and remanded the case to the district court for it "to determine whether it understood the full scope of its authority." *Id.* at 501.

In *United States v. Restrepo*, 999 F.2d 640 (2d Cir.1993), on the other hand, we held that a district court exceeded its authority under the Guidelines when it granted a downward departure to compensate for the period of INS confinement that convicted aliens who complete their sentences may have to serve later, pending deportation. *Id.* at 646. For the reasons that follow, we believe that Montez–Gaviria's case more closely resembles *Ogbondah* than *Restrepo*.

The most important factor distinguishing the instant case (and *Ogbondah*) from *Restrepo* is that in *Restrepo*, the district court granted a downward departure in *anticipation* of the defendant's possible post-imprisonment, pre-deportation confinement. The court did so by estimating the likely length of this period based on the average time of pre-deportation confinement. We pointed out that departing downward in anticipation of "a possible delay ... is speculative and inappropriate." *Restrepo*, 999 F.2d at 646.[4] By

contrast, neither Montez–Gaviria's nor Ogbondah's requests for downward departures anticipated a period of indeterminable uncredited confinement. Their periods of uncredited incarceration were not merely certain; they had already occurred by the time they were sentenced.

We conclude that a period of time during which an alien is incarcerated solely due to the federal government's delay in transferring him to federal custody and for which the alien does not receive credit toward his sentence provides a valid ground for departing from the Guidelines, at least to the degree that the departure approximately compensates the alien for the uncredited time of confinement. We do not, of course, express any opinion as to whether the district court in this case should exercise its discretion to grant such a downward departure to Montez–Gaviria.

### E. The Consequences of the Error

Having found that the district court erred in attempting to credit Montez–Gaviria's sentence directly for the uncredited time he served in state custody and that the district court, as an alternative to a direct credit, could have chosen to depart downward, we now turn to the issue of whether we should remand to the district court to enable it to reconsider its decision not to depart downward by more than one level. Montez–Gaviria contends that resentencing is appropriate. He asserts that the district court, had it known that it could not control the date that Montez–Gaviria's sentence began, would most likely have departed downward by more than it did. The government, on the other hand, claims that the district court "made it abundantly clear" that it would not grant Montez–Gaviria more than a one-level departure and that no connection exists between the district court's mistake and its decision to limit its departure to one level. It therefore urges us to remand the case only for the limited purpose of striking the por-

---

ward departure. The government's acquiescence is not clear, however.

**4.** Furthermore, our opinion noted that the district court's departure had reduced Restrepo's

sentence by eight months on the basis of an average pre-deportation incarceration that lasted 59 days. *See id.*

tion of the sentence that seeks to determine the commencement of Montez–Gaviria's sentence.

While the relationship between the district court's mistaken sentencing credit and its decision to depart downward by only one level is less certain than Montez–Gaviria would have us believe, we do not think that the district court considered the departure and the sentence commencement issues separately. During the sentencing hearing, Montez–Gaviria's counsel raised the matter of his client's uncredited time served, asserting it as "an additional reason" for departing downward by more than one level. After the court expressed concern about this uncredited time, the government suggested directly crediting Montez–Gaviria's time served as an alternative to a two-level departure.[5] Prior to that point, the parties and the court, in discussing Montez–Gaviria's uncredited state time, had focused solely on whether that time should lead to a two-level departure. And, until the government raised the sentencing credit option, the court had been considering the uncredited incarceration as one of the most important factors in the decision it was about to make.

Accordingly, it is not surprising that the sentencing hearing transcript does not support the government's position that the district court would have granted only a one-level departure even if it had known that it could not give Montez–Gaviria a direct sen-

tence credit. The district judge expressed his inclination that a one-level (rather than two-level) departure was appropriate only *after* the government had introduced the possibility of the sentence credit. He did this, in other words, when he no longer believed that a downward departure was the only way that he could take into account Montez–Gaviria's time served in state custody.[6]

At a minimum, this makes the record unclear as to whether the district court's mistaken belief that it could directly credit Montez–Gaviria's time served in state custody influenced its decision not to depart downward by more than one level. When the record is ambiguous as to whether a district court has allowed a mistake of law to affect its sentencing decision, we have regularly remanded to allow the court to reconsider its decision in light of our correction of the mistake. *See, e.g., United States v. Ogbondah,* 16 F.3d 498, 501 (2d Cir.1994) (remanding where there was "a real possibility that the court misunderstood its power to depart downward"); *United States v. Trzaska,* 859 F.2d 1118, 1121 (2d Cir.1988) (remanding "in light of the ambiguity in the record as to whether the district court complied with the requirements of Fed.R.Crim.P. 32(a)(1)"). In such cases, we do not decide whether district court's mistake actually affected its application of the Guidelines, we simply conclude that that is a question best answered by the district court itself.[7]

---

5. The government's lawyer did qualify his suggestion by remarking that he was unsure "that that is the right thing to do." But what is important is not whether the government actually advocated a sentence credit. What matters instead is whether the district court, in deciding not to depart by two levels, was affected by its belief that a direct sentence credit was available.

6. This fact distinguishes our case from *Labeille–Soto,* in which we held that remand for resentencing was not appropriate because the district court already had explicitly rejected the defendant's contention that the government's delay in commencing its prosecution while the defendant served time on a state sentence warranted a downward departure. *Labeille–Soto,* 163 F.3d at 100–01.

7. Nor does the fact that Montez–Gaviria's counsel referred to the uncredited time served as "an *additional* reason for the Court to consider exercising its discretion" (emphasis added) to depart by more than one level, rather than as "an inde-

pendent ground for departure," alter our analysis. It is clear that until the government raised the direct sentence credit as an option, the district court was considering both Montez–Gaviria's stipulation to deportation and his uncredited time in state custody as bases for departing downward from the Guidelines. Once the court had satisfied itself that it could take the time in state custody into account with a direct sentence credit, it decided to grant Montez–Gaviria a one-level downward departure based on his agreement not to contest his deportation. Regardless of whether Montez–Gaviria's counsel had asserted the uncredited time as an independent ground for a one-level departure or as an argument for increasing the deportation departure by one level, we are left with a functionally identical question: Would the district court have departed downward by an additional level if it had known that it could not directly credit Montez–Gaviria's time served in state custody?

## F. Scope of Resentencing

During the sentencing hearing, the district court considered departing downward both on the basis of Montez–Gaviria's uncredited time and of his stipulation not to contest deportation upon the completion of his sentence. The court decided, with the government's consent, to grant a one-level departure in view of the stipulated deportation. It follows that, if we remand for plenary resentencing, the question of whether Montez–Gaviria should receive a downward departure on the basis of his agreement to be deported might again arise. For the reasons that follow, that question may not be a simple one.

The U.S. Attorney's Office for the Southern District of New York began agreeing to downward departures based on consented deportation as part of an "experimental program" initiated in response to a memorandum that the Attorney General issued in April 1995 authorizing U.S. Attorneys to consent to a one or two-level downward departure in return for a stipulated agreement by a criminal alien defendant to accept a final order of deportation. The downward departures were intended to facilitate the deportation of criminal aliens.

Pursuant to its program, the Southern District U.S. Attorney's Office has regularly consented to one-level departures under Sentencing Guidelines § 5K2.0, the catch-all departure provision, in cases of stipulated deportation. While some other districts within this circuit, including the District of Connecticut and the Western District of New York, have routinely granted two-level departures, courts in the Southern District have generally given only one-level departures in such cases.

But the fact that the government has agreed to such departures did not resolve the issue of whether, and under what circumstances, a sentencing court in fact has the authority to depart downward on the basis of a defendant's stipulation to deportation. And, on various aspects of this question, the circuits have divided.

Thus, the Ninth Circuit has held that because the executive branch, rather than the court, deports an alien defendant, the sentencing court may only depart downward if the government requests such a departure. *See United States v. Flores–Uribe,* 106 F.3d 1485, 1486–88 (9th Cir.1997). The First Circuit, instead, did not concern itself with the relevance of the government's consent, but countenanced the possibility of departing downward on the basis of stipulated deportation only if the defendant shows that by doing so he or she is waiving a nonfrivolous defense to deportation. *See United States v. Clase–Espinal,* 115 F.3d 1054, 1058 & n. 6 (1st Cir.), *cert. denied,* —— U.S. ——, 118 S.Ct. 384, 139 L.Ed.2d 299 (1997). The First Circuit's rationale for this condition is that unless the defendant is forgoing a valid defense, the waiver is unlikely to reduce significantly the time and resources expended in the deportation process. The Third Circuit has adopted both the Ninth Circuit's requirement that the government agree to the departure and the First Circuit's condition that the defendant's stipulation involve a waiver of nonfrivolous defenses. *See United States v. Marin–Castaneda,* 134 F.3d 551, 555–56 (3d Cir.), *cert. denied,* —— U.S. ——, 118 S.Ct. 1855, 140 L.Ed.2d 1103 (1998). We have, on at least one prior occasion, cited this disagreement among the courts and expressly resolved the case then before us without deciding the issue. *See United States v. Zapata,* 135 F.3d 844, 847–48 (2d Cir.1998).

To make matters more complicated, in November 1997, the Acting Assistant Attorney General for the Criminal Division of the Justice Department sent a memorandum to all federal prosecutors who handle cases involving alien defendants in which he cautioned that recent developments had cast doubt on whether such departures remained appropriate. The 1997 memorandum noted that the Illegal Immigration Reform and Immigrant Responsibility Act (IIRAIRA), Pub.L. No. 104–208, 110 Stat. 1570, 1701–1703 (1996), "streamlin[ed] the removal process" for many alien defendants, thus "substantially reduc[ing] the benefit the Government derives solely from an alien's concession of alienage and stipulation to removal." And the Assistant Attorney General also cited the First Circuit's holding in *Clase–Espinal* that a defendant's consent to deportation was not a valid basis for departing downward from the Sentencing Guidelines unless the defen-

dant in so doing waived a nonfrivolous defense to deportation. *See* 115 F.3d at 1058 n. 6. As a result, in July 1998, the U.S. Attorneys for the Southern District and Eastern District of New York informed the chief judges of those districts that they would no longer support downward departures for alien defendants who consented to deportation. In this case, the government has taken the position that "[w]hile there may be the occasional rare case in which a defendant's stipulation to deportation is truly extraordinary and provides the Government with significant and unique benefits warranting a departure, in the routine case there is nothing extraordinary about a defendant's stipulation to deportation and it provides the Government with little benefit."

Apparently because of this change in policy, the government initially told Montez–Gaviria's counsel that it would not agree to a downward departure based on his client's consent to deportation if we were to remand for resentencing. But the government has subsequently reconsidered its position and now states that it will not challenge the downward departure, grounded on Montez–Gaviria's consent to deportation, that the district court granted during his original sentencing.

It follows from this discussion that ordering a plenary remand of the instant case might require resolution of a difficult issue of law that is unresolved in this circuit, that neither party raised during the initial sentencing or on appeal, and that—given the government's specific promise not to revisit the issue in this case upon resentencing— neither of them wishes to contest now. Accordingly, we see no benefits from a plenary remand. Under the circumstances, by limiting our remand to the only portion of the district court's sentencing decision potentially affected by its mistake (the question of whether Montez–Gaviria's time in state custody should be taken into account by means of a downward departure), we choose to avoid creating the possible necessity of deciding whether stipulated-deportation departures are valid.

 We also instruct the district court not to proceed with resentencing until Montez–Gaviria is again present. In one sense, given our limited remand, the sentence that Montez–Gaviria might receive upon remand cannot be harsher than the sentence he actually received at his initial sentencing. But unless the district court grants him a downward departure that reduces his jail time by at least eight months,[8] his new sentence will be more severe than what his sentence *appeared* to be originally. We think that suffices to make resentencing without Montez–Gaviria's presence inappropriate.

### III. Conclusion

The district court erred when—in an attempt to compensate for the uncredited time that Montez–Gaviria had served in state prison awaiting transfer to federal custody (solely due to an INS detainer)—it deemed Montez–Gaviria's sentence to have commenced while he was in state custody. The court's decision not to depart downward from the Sentencing Guidelines on the basis of this uncredited time served is reviewable on appeal because the court's mistaken belief that it could directly credit Montez–Gaviria's sentence may have affected its determination. In light of the ambiguity in the record as to whether the district court's mistaken belief actually influenced its decision not to depart, we remand the case to the district court for the limited purpose of permitting it to decide whether to exercise its discretion to depart further downward from the Sentencing Guidelines on the basis of the defendant's uncredited time served. Because Montez–Gaviria is no longer present in this country, however, this limited resentencing should not take place until such time as he returns and is again before the court.

---

**8.** To give Montez–Gaviria a 33-month sentence, which is what it appears that the district court attempted to do by directly crediting his 41-month sentence for the eight months of uncredited time, would require an overall downward departure of three levels—that is, two additional levels beyond the one-level stipulated-deportation departure granted at Montez–Gaviria's initial sentencing.